PERCY W. PHILLIPS AND BETTY R. PHILLIPS (HUSBAND AND WIFE), PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 60084. Filed June 30, 1958.

*Percy W. Phillips, pro se.*
*William Schwerdtfeger, Esq.,* for the respondent.

Respondent determined a deficiency in income tax for the year 1952 in the amount of $10,061.59. The petition raised two issues and made a claim for a refund based on respondent's determination in the statutory notice of deficiency that petitioners had overstated their dividend income and income from a partnership. In his answer respondent admitted that dividend income and income from a partnership had been overstated. One of the issues raised by the petition has been settled by the stipulation filed herein. The remaining question for our decision is whether the respondent erred in his determination that "the

increment or profit [petitioner] realized on the assignment in 1952 of an endowment insurance policy is taxable as ordinary income."[1]

### FINDINGS OF FACT.

Some of the facts have been stipulated. The stipulation and exhibits annexed thereto are incorporated herein by this reference.

Petitioners Percy W. Phillips (hereinafter referred to as petitioner) and Betty R. Phillips are husband and wife residing in Chevy Chase, Maryland. For the calendar year 1952 they timely filed a joint income tax return with the district director of internal revenue at Baltimore, Maryland.

Petitioner is currently a practicing lawyer, a partner in the law firm of Ivins, Phillips and Barker. Richard B. Barker and John C. Reid are also partners in the firm. Petitioner, Barker, and Reid largely specialize in Federal tax matters.

In the year 1931 petitioner insured his life with the Connecticut Mutual Life Insurance Company (hereinafter referred to as the company) for the sum of $27,000. At the time the petitioner was married and had 4 children, the oldest of whom was 9, and the youngest of whom was 3 years of age.

On or about April 18, 1938, pursuant to provisions contained in the life insurance policy, it was converted to a fully paid endowment policy providing for the payment of $27,000 to petitioner on March 19, 1952, if he was still living at that time, or to his estate or named beneficiary upon his earlier death. Petitioner agreed to pay annual premiums of $1,444.78[2] for 21 years from the date of the issuance of the original policy (March 19, 1931) or until his earlier death. This policy is endorsed: "Issued in exchange for original policy of same number, in the sum of $27,000, dated February 10, 1931, with premiums paid in full."

Petitioner is not a dealer in securities or life insurance policies.

The policy contained, *inter alia*, the following clauses:

*The Dividend.* This Policy, upon payment of the second annual premium and during its continuance thereafter as a premium-paying, paid-up or extended insurance policy, will participate annually in the divisible surplus which shall be determined and apportioned by the Company.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

*Assignments.* No assignment of this Policy shall be binding upon the Company until the original or a copy thereof is filed at the Home Office of the Company in Hartford, Connecticut. The Company will not be responsible for the validity of any assignment.

\*　　　\*　　　\*　　　\*　　　\*　　　\*　　　\*

---

[1] In an amendment to his answer, respondent claimed an increased deficiency by decreasing the cost of the policy to petitioners. At the hearing herein, respondent conceded that the cost of the policy was $21,360.49, the figure used in petitioners' return.

[2] Including a premium of $127.45 for a "Disability Provision" whereby the company agreed to pay petitioner $250 per month in the event of total and permanent disability.

*Cash Value.* At any time after due payment of two or more full annual premiums hereon, and on surrender of this Policy by the Insured, the Company will pay the Cash Value of this Policy in full settlement of the liability of the Company hereunder; provided that the Company may defer such surrender and payment for a period not exceeding sixty days after application. therefor.

Such Cash Value shall be as follows:

(1) If there shall have been no failure to pay premiums as provided in this Policy, the Cash Value on the due date of an annual premium shall be the then reserve hereon, increased by the reserve on any outstanding paid-up additions hereto, less a charge per $1,000 face amount of this Policy, which if two full annual premiums are paid is $12, if three are paid is $8, if four are paid is $4, and which after five full annual premiums are paid is eliminated; a proportionate adjustment to be made on account of the payment of any additional instalment of an annual premium in excess of full annual premiums; and the Cash Value at other than premium due dates to be the Cash Value at the end of the term for which premiums are paid discounted at the rate of 5% per annum, but in no event less than any previous Cash Value;

(2) If this Policy be a policy of Paid-up * * * Insurance the Cash Value shall be the then reserve hereon * * *

The policy also provided that "the Values guaranteed by this Policy for the end of the years specified appear below. * * *":

| Years elapsed | Per $1,000 face amount cash or loan value | Years elapsed | Per $1,000 face amount cash or loan value |
|---|---|---|---|
| 2 | $54.32 | 12 | $474.75 |
| 3 | 93.20 | 13 | 523.95 |
| 4 | 133.27 | 14 | 575.01 |
| 5 | 174.59 | 15 | 628.07 |
| 6 | 213.19 | 16 | 683.28 |
| 7 | 253.13 | 17 | 740.85 |
| 8 | 294.45 | 18 | 801.00 |
| 9 | 337.21 | 19 | 864.01 |
| 10 | 381.47 | 20 | 930.21 |
| 11 | 427.29 | 21 | 1,000.00 |

The cash values set out in the policy represented the amounts of reserve set up by the company for the payment of the obligations called for by the contract of insurance. These amounts were calculated by actuaries employed by the company, who assumed in these calculations, *inter alia*, that the mortality rate among its insureds would be according to the American Experience Table of Mortality, that the earnings of the company upon the moneys paid into it would be at the rate of 3 per cent compounded annually, and that the expenses embraced in the term "cost of insurance" would be a certain amount. At no time would the amount of the reserve, or cash surrender value, of the policy here in question be greater than the gross amount of the premiums payable in the amounts and at the time called for by the policy undiminished by so-called "dividends" paid or credited to the policyholders of the company, which was a mutual insurance company. If petitioner had paid all of the premiums at the times called for by the policy (undiminished by such "dividends") the total amount of such

premiums paid (omitting that part paid for Disability Benefit) would have been $27,663.93 at the time the policy matured, while the reserve would have been $27,000. The parties are in agreement that the cost of the policy to petitioner as of March 7, 1952, was $21,360.49. On the same date the cash surrender value of the policy was $26,973.78.

On March 7, 1952,[3] petitioner assigned and transferred all his right, title, and interest in and to the policy to Barker and Reid in exchange for $26,750 in cash. This transfer was accomplished on a form provided by the company which petitioner had secured sometime in advance of the transfer. The assignment was received and filed at the home office of the company on March 11, 1952. This assignment reads in material part as follows:

For value received, I hereby assign and transfer to *Richard B. Barker and John C. Reid, jointly or survivor of them, or if neither be living, the executors, administrators or assigns of the last to die of the said Richard B. Barker and John C. Reid* of *Washington, D. C.* for *their* own use and benefit all my right, title and interest in and to Policy No. *731,300* on the life of *Percy W. Phillips* issued by The Connecticut Mutual Life Insurance Company in the face amount of *Twenty-Seven Thousand* dollars together with all profits due or to become due thereon and all rights, privileges and benefits contained therein or that may be attached thereto. And I agree for myself, my executors, administrators and assigns, to warrant and defend the title to the policy to the above named assignee against all persons, and I guarantee the validity and sufficiency of this assignment.

I appoint the above named assignee my attorney in fact with full power of substitution for me and in my name, but for his own use and benefit, to

exercise use of any and all options, privileges and rights accorded by the policy;

execute any releases or other documents which may be required;

assign, pledge or surrender the policy;

collect the proceeds of the policy at maturity; and

give a complete discharge for all moneys which may be paid under the policy.

I warrant that I am the only owner of the policy and legally competent to make this assignment, that I have no outstanding obligation constituting a lien upon or claim against the policy, and that no proceedings in bankruptcy or insolvency or otherwise in law or in equity which would affect the title of the policy are pending against me.

On March 7, 1952, Barker and Reid assigned and transferred in an identical form (provided by the company) their right, title, and interest in the policy to the Union Trust Company of the District of Columbia. This transfer was received and filed at the home office of the company on March 11, 1952.

On March 20, 1952, upon maturity of the policy, the company paid to the Union Trust Company the sum of $27,117.45, consisting of the face amount of the policy ($27,000) plus a dividend ($117.45).

---

[3] This date is stipulated. However, the assignment itself bears the date of March 6, 1952.

On March 7, 1952, petitioner deposited $26,750, the proceeds of the transfer of the policy, in his checking account with the Liberty National Bank, Washington, D. C.

Cullen Hormes, petitioner's son-in-law, wished to purchase a new home in Maryland. In order to finance this purchase pending the sale of Hormes' old home, petitioner issued a certified check to Hormes drawn on the petitioner's bank account for $3,981. This certified check was debited to petitioner's account on March 7, 1952. After this check was charged against the account, and before the deposit of the check for $26,750, the balance in petitioner's account was $926.72.

On March 10, 1952, petitioner issued two checks on this account in the amounts of $2,000 and $23,500. The check for $2,000 was made payable to the order of the Federal Reserve Bank. The check for $23,500 was made payable to the order of W. B. Hibbs and Company, stockbrokers. This amount was credited to petitioner's account by W. B. Hibbs and Company on March 12, 1952, and charged to his checking account by the Liberty National Bank on March 13, 1952. On March 18, 1952, W. B. Hibbs and Company charged to petitioner's brokerage account the following stock purchases:

| | |
|---|---:|
| 100 shares Irving Trust Company at 21¾ | $2, 195. 88 |
| 100 shares Texas Company at 55¾ | 5, 606. 58 |
| 200 shares Standard Oil of N. J. at 76 | 15, 267. 20 |
| Total | 23, 069. 66 |

### OPINION.

KERN, *Judge:* The sole remaining issue in this case is whether petitioner realized capital gain or ordinary income as a result of his transfer of the insurance policy here involved to Barker and Reid shortly before it matured. Respondent contends first that this transfer was not a sale or exchange within the meaning of section 117 (a) (4) of the Internal Revenue Code of 1939,[4] urging "that however effective such a conveyance may be for other purposes, it is ineffective taxwise." In support of this contention, respondent relies mainly on *Gregory* v. *Helvering*, 293 U. S. 465 (1935), and *Helvering* v. *Clifford*, 309 U. S. 331 (1940). In the alternative, he argues that the excess of the surrender value of this policy over its cost represents interest paid by the company and, since such interest would be taxable to petitioner as ordinary income, petitioner should not be allowed to convert it to capital gain merely by the method used to collect the

---

[4] SEC. 117. CAPITAL GAINS AND LOSSES.

  (a) DEFINITIONS.—As used in this chapter—

    \*      \*      \*      \*      \*      \*      \*

    (4) LONG-TERM CAPITAL GAIN.—The term "long-term capital gain" means gain from the sale or exchange of a capital asset held for more than 6 months, if and to the extent such gain is taken into account in computing gross income;

proceeds. In this connection he contends that "[t]he fruit constitutes interest regardless of the direction of the twist given to detach it from the tree, and should be levied upon accordingly."

Petitioner contends that this transfer was a bona fide sale of a capital asset and must be treated accordingly. He argues that as a taxpayer he is entitled to arrange his affairs in such a manner as to result in the lowest possible tax burden so long as there is no element of sham or fraud in the transaction. In answer to respondent's alternative contention he argues that the amount he was entitled to receive in excess of his basis for the policy is not interest but rather the result of many factors considered in the actuarial calculations of the insurance company.

There is no doubt that this policy constituted a capital asset in petitioner's hands. Petitioner is not a dealer in securities or life insurance contracts. See sec. 117 (a), I. R. C. 1939. However, the surrender by petitioner of the policy either at maturity for its face amount or earlier for its cash surrender value would not be considered a sale or exchange and consequently the excess of the proceeds over petitioner's basis would have been taxable as ordinary income. *Frank J. Cobbs*, 39 B. T. A. 642; *Bodine* v. *Commissioner*, 103 F. 2d 982 (C. A. 3, 1939), affirming a Memorandum Opinion of this Court, certiorari denied 308 U. S. 576. The first question, then, for our consideration is whether this transfer was a sale or exchange within the meaning of the Internal Revenue Code.

At the trial of this case petitioner testified that the transfer of this policy 12 days before it matured had a threefold motive: (1) To take advantage of the lower capital gains rates, (2) to allow him to fulfill his promise of financial aid to his son-in-law who was purchasing a new residence, and (3) to allow him to take advantage of what he considered to be a favorable time in which to purchase stocks. Our study of the record, however, convinces us that the tax motive was uppermost and dominant in petitioner's mind. Petitioner is a practicing attorney specializing in tax matters. Barker and Reid, petitioner's partners in the practice of law, also specialize in Federal tax matters. Petitioner's bank account reveals that his certified check to his son-in-law was debited by the bank to his account before the proceeds of the transfer of the policy were deposited by him, and even after such debit a comfortable balance remained in the bank account. As for the purchase of stock, petitioner stated: "I was also of the opinion at that time that the stock market represented a period of relatively low prices and it would be well to make some purchases in the market." However, nowhere in the record do we find any sense of urgency connected with petitioner's desire to invest in stocks. His check to the order of his broker was issued on March 10, 1952, and the stock purchases were not charged to his account until

March 18, 1952. In our opinion, there can be no doubt that petitioner was not only aware of the tax consequences of his actions, but that the purpose of achieving such consequences was the primary and dominant motive causing him to make this transfer.

However, this conclusion (which does not appear to be seriously contested by petitioner) is not determinative of the issue before us. There is no doubt that a taxpayer may arrange his affairs in such a manner as to minimize his taxes, so long as the means adopted are legal, bona fide, and not mere shams to circumvent the payment of his proper taxes. *Gregory* v. *Helvering, supra.* In that case, at page 469, the Supreme Court said:

The legal right of a taxpayer to decrease the amount of what otherwise would be his taxes, or altogether avoid them, by means which the law permits, cannot be doubted. *United States* v. *Isham,* 17 Wall. 496, 506; *Superior Oil Co.* v. *Mississippi,* 280 U. S. 390, 395–6; *Jones* v. *Helvering,* 63 App. D. C. 204; 71 F. (2d) 214, 217. * * *

Of course, a sale which is made for the purpose of minimizing taxes invites careful scrutiny to determine whether the sale was bona fide or merely a sham transaction intended to qualify the vendor for capital gains treatment of the increment therefrom rather than ordinary income treatment. *Clara M. Tully Trust,* 1 T. C. 611 (1943). See also *Helvering* v. *Clifford, supra.*

In the instant case we have carefully scrutinized the transaction in question and are of the opinion that the sale was a real and bona fide sale. Petitioner surrendered all of his right, title, and interest in the policy to Barker and Reid for adequate consideration. After the transfer he retained no vestige of control over the policy or its transferees. There was no agreement between petitioner and Barker and Reid as to their subsequent disposition of the policy. Petitioner had no control, direct or indirect, over the policy or its transferees after its disposition by him. Barker and Reid thereafter dealt with the policy as their own and disposed of it as they saw fit.

We may assume that Barker and Reid are warmhearted, generous individuals and devoted friends of petitioner. However, there is no reason to believe that they were or would be petitioner's puppets. Our analysis of the facts is that Barker and Reid were willing to accommodate petitioner [5] by purchasing his rights under the policy if they could buy at a price which would guarantee them a quick profit. We feel sure that once having purchased the policy from petitioner whose sole interest in the transaction was to effect its sale, their subsequent disposition of it would be dictated by considerations relating only to their own financial advantage. We are also satisfied that petitioner's motive in the transaction was not to bestow

[5] The fact that the purchase was one of accommodation would not affect the nature of the transaction as a sale. *John D. McKee, et al., Trustees,* 35 B. T. A. 239.

a largess upon Barker and Reid, but, as we have indicated, to make a sale of the policy in order to effect the taxation of the proceeds at capital gains rates. In order to accomplish this sale it was necessary for petitioner to fix a price which would result in a profit to the purchaser. Having decided to make the sale at such a price, it was natural that he would make the offer of sale to his partners, not because he expected them to be subservient to his wishes, but because if a profit had to be made by the purchaser it might as well be made by his partners, and also because it avoided the necessity of peddling the policy among the general public.

Petitioner is a lawyer. He intended to accomplish a sale of his interests in the policy. He did everything and omitted nothing necessary to effect such a sale. Barker and Reid were not his creatures subject to his control. No fact of record negates the characterization of the transaction as a sale. It is our opinion that on the record before us it must be considered to be a sale for all purposes. See *Clara M. Tully Trust, supra* at 620, 621.

Having concluded that the transaction constituted a real and bona fide sale, it necessarily follows that it was not, as respondent contends, an agency arrangement masquerading as a sale.

Respondent's reliance on *Gregory* v. *Helvering, supra*, and *Helvering* v. *Clifford, supra*, is misplaced. In the instant case there was no temporary entity created merely to act as a conduit for the property involved as in the *Gregory* case. Nor did petitioner retain any of the dominion and control over the transferred property that was present in the *Clifford* case. Respondent also cites *Griffiths* v. *Commissioner*, 308 U. S. 355 (1939); *Minnesota Tea Co.* v. *Helvering*, 302 U. S. 609 (1938); *Higgins* v. *Smith*, 308 U. S. 473 (1940); and *Commissioner* v. *Court Holding Co.*, 324 U. S. 331 (1945), in support of his contention. These cases are similarly distinguishable in that in each of them the taxpayer retained some form of dominion and control over the property after the transfer. They each involve transactions which, though technically within specific provisions of the Code, were used merely to disguise the realities of the transactions. Such dominion and control and disguise are not present in the instant case.

In the alternative, respondent argues that the increment realized by petitioner on this transaction, or that which would have been realized by him at maturity had he retained the policy, represents interest earned on his investment which is said to be the net premiums paid by petitioner, and that even a sale or exchange within the meaning of the Internal Revenue Code accomplished prior to the maturity of the policy cannot convert this ordinary income into capital gain. *Helvering* v. *Horst*, 311 U. S. 112 (1940); *Fisher* v. *Commissioner*, 209 F. 2d 513 (C. A. 6, 1954), affirming 19 T. C. 384 (1952); *F. Rodney Paine*,

23 T. C. 391, revd. 236 F. 2d 398; *Charles E. Sorensen*, 22 T. C. 321 (1954) ; *Bessie Lasky*, 22 T. C. 13.

The precise question before us is whether the sum of the periodic increases in the cash surrender value of an endowment insurance policy which is in excess of the insured's net cost of the policy constitutes accrued but unpaid ordinary income to the insured, so that the sale of the policy by the insured, including the right to collect such cash value, at a price in excess of his cost may be considered to be the realization of such ordinary income within the reasoning of the cases cited by the respondent.

Respondent in his argument stresses two facts: First, that an interest factor (3 per cent compounded annually) is used in determining the amount of the reserve and cash value of the policy, and, second, that the proceeds from the sale of the policy including, of course, the right to such cash surrender value, were in excess of the insured's cost of the policy. Respondent concludes that the transaction here in question should be treated for tax purposes as though it was equivalent to the sale of an obligation upon which there was accrued but unpaid interest, and that the excess of the purchase price over the insured's cost of the policy should be treated as though it was a realization of interest and, consequently, a receipt of ordinary income.

The cash value of the policy as of the end of each year of the policy's life is fixed by the contract of insurance and is in the amount of the reserves periodically allocated to the policy by the insurance company in sums considered necessary by its actuaries to pay its obligations under the policy. It is made upon certain actuarial assumptions. Among these are the assumptions that the mortality rate of the company's insured will not be in excess of that indicated by the American Experience Table of Mortality, that the earnings of the company upon the funds available to it for investment will be equivalent to 3 per cent compounded annually, and that the "cost of insurance" will be in a certain amount. The amount of the reserves calculated upon these actuarial assumptions is a theoretical amount conservatively computed for the purpose of providing for the solvency of the company and the soundness of its insurance protection. It is hoped and expected and in actual practice it frequently happens that the rate of mortality among its insureds will be less than that assumed, that its earnings will be greater than those assumed, and that the "cost of insurance" will be less than that assumed. If as a result of any or all of these occurrences a mutual insurance company finds that after setting aside the reserves required under its actuarial computations, and after creating other additional voluntary reserves for contingencies, its premium receipts are in excess of the amounts needed for the conduct of its business, it does not increase the cash values of

its policies [6] but it frequently declares "dividends" or makes rebates to its policyholders of a part of the premiums collectible under its policies, thus in effect reducing the cost of insurance below that contracted for in the policies. By Regulations 111, section 29.22 (a)–12, it is provided that "[a]mounts received as a return of premiums paid under life insurance, endowment, or annuity contracts, and the so-called 'dividend' of a mutual insurance company which may be credited against the current premium, are not subject to tax." However, it is obvious that the receipt of such "dividends" serves to reduce the cost of the policy to the insured.

In the instant case there is no issue as to the cost of petitioner's policy. The parties have agreed that it is $21,360.49. Therefore, no evidence has been adduced showing how that cost was computed. If the premiums called for by the policy had been paid annually there would have been no excess of cash value over cost. Even if the prepayment of the stated premiums made by petitioner in 1938 had been made at a discounted figure, it is apparent that any such excess would have been in a minimal amount. A fair inference is that the excess of cash value over cost as of March 7, 1952, was due to the reduction of petitioner's cost below that called for by the policy itself by reason of "so-called 'dividend[s]' of a mutual insurance company * * * credited against the current premium[s]."

We conclude that the excess of the cash value of petitioner's endowment policy on March 7, 1952, over his net cost of the policy did not represent accrued but unpaid ordinary income realized by him by his sale of the policy on that date. The "increment or profit" realized by the petitioner by his sale of the endowment insurance policy here in question is not taxable ordinary income.

Reviewed by the Court.

*Decision will be entered under Rule 50.*

---

HARRON, *J.*, dissenting: The initial question here is whether the transaction on March 7, 1952, between petitioner and his two close business associates, Barker and Reid, constituted a sale. I am unable to agree that there was a true sale. The answer to this question is determined by the facts which are restated below. Other facts relating to reserves and what is regarded as a second, or alternative question, are beside the point and serve to confuse and detract from the only substantive question.

The 21-year endowment policy in the principal amount of $27,000, effective from March 19, 1931, became fully paid on April 18, 1938, on the basis of petitioner's payment of annual premiums of $1,317.33 (excluding the disability premium of $127.45) for 21 years. The

[6] These remain at the theoretical contractual amounts provided for in the policies regardless of the actual earnings or rate of mortality or "cost of insurance" of the company.

total premiums were prepaid as of April 18, 1938, presumably at a discount which is not shown by the record before us. The Connecticut Mutual Life Insurance Company held the fund created by petitioner's payments for several years. On March 7, 1952 (when the transaction of petitioner took place), the policy had a cash surrender value of $26,973.78, and the principal amount of $27,000 was to become payable 12 days later on March 19, 1952. Phillips had a right to demand and receive from Connecticut Mutual Life, the obligor, $26,973.78 on March 7, 1952. Instead of making demand on the obligor under the contract for payment of the amount payable to him under the matured contract on March 7, 1952, Phillips made use of the form of assignment of the contract which was available and turned the policy over to Barker and Reid, who, again, made use of a form of assignment and turned the contract over to a bank, which in turn surrendered the contract to the obligor, Connecticut Mutual Life Insurance Company, which then paid the principal amount of the contract, or policy, as of its maturity date. These steps were taken at the time that the cash surrender value of the policy was $26.22 less than the principal amount payable on maturity 12 days after the first step was taken. Phillips' procedure was instituted so close to the date of maturity of the policy as to be on the eve thereof. But the fact that the policy would mature on March 19, 1952, should not divert attention from the point that on March 7, 1952, the cash surrender value of the policy was $29,973.78, and on that date nothing stood in the way of Phillips' surrendering the policy to the obligor for payment of the then cash surrender value. The record does not support the conclusion that there were any business purposes served, or real needs taken care of, by his going to Barker and Reid for the amount which he could have obtained as readily from the obligor. Rather, the record shows clearly that the desire of Phillips' to obtain capital gains treatment of the gain he stood to realize, and to avoid tax on the full amount of the gain was his primary purpose. Also, it appears that Phillips may have had the idea that there was a precedent in an unreported memorandum decision of this Court where under the particular facts of that case a taxpayer received capital gains treatment of the accrued profit under a policy by assigning it to a third party for a consideration. See 1 C. C. H. 1953 Fed. Tax Rep., par. 91.0233, "Gain or loss on surrender or exchange of policies."

The issue here presents a substance versus form problem. It is similar to the problem presented in *Lucas* v. *Earl*, 281 U. S. 111, because Phillips' arrangement was clearly an anticipatory arrangement for the following reasons: The rule had been established in 1939 in *Bodine* v. *Commissioner, supra*, that the surrender of a policy (very much like the one involved here) to the obligor (insurer) constitutes neither a sale nor exchange, and that the excess of the sum payable by the obligor over the premiums or consideration paid is ordinary income,

taxable in full, under the all-inclusive definition of gross income in section 22 (a), 1939 Code. Furthermore, the Commissioner had promulgated in Regulations 111, section 29.22 (a)–12, the ruling that the so-called dividends paid by a mutual insurance company under a policy (such as the one in question) are not includible in the gross income of the "insured" (or the owner of the contract, or policy) in the year of payment or accrual by the mutual insurance company because such so-called dividends constitute a partial return of premiums and serve to reduce the cost of the policy to the owner, insured, obligee, or whatever term is most suitable. In this instance, during the existence of the policy, Connecticut Mutual Life Insurance Company had paid Phillips so-called dividends, totaling in the neighborhood of $6,303.44 (the difference between $27,663.93 and $21,360.49), and, therefore, that amount of premiums had been returned to him; and, therefore, his cost of the policy had been reduced from $27,663.93 (subject to adjustment for prepayment of premiums) to $21,360.49; and, therefore, he stood to realize gain in the amount of at least $5,613.29 (the excess of cash surrender value of $26,973.78 over cost of $21,360.49) upon surrender of the policy to Connecticut Mutual on or about March 7, 1952. Phillips wanted to avoid tax on the full amount of $5,613.29, which he would have to pay if that amount constituted ordinary income under section 22 (a). If he could convert the already accrued gain on the policy to capital gain in advance of surrender of the policy to Connecticut Mutual, only one-half, $2,806.65, would be taxable.

The step which was taken which involved Barker and Reid must have been practically a wash-out as far as tax consequences to them was concerned because their so-called "cost," on March 7, 1952, was $26,750 (the amount they advanced momentarily to Phillips); they turned the policy over to a bank on the same day and received from the bank (presumably and at least) the then cash surrender value $26,973.78; and their "gain" of at least $223.78 was so small that the tax thereon would be offset by their "gain" and they would not be out anything. (The record does not show what the bank gave Barker and Reid under the second step. The bank may have given them only $26,750; we do not know.)

In this anticipatory arrangement, Barker and Reid were no more than intermediaries between Phillips and Connecticut Mutual, or Phillips' agent. See *Bessie Laskey, supra.* Since Phillips could have received directly from the obligor on March 7, 1952, the sum of $26,973.78, had he dealt directly with it, he realized $223.78 less than the then cash surrender value of the policy, and that amount was in reality the fee he gave Barker and Reid for acting as his agents, or as intermediaries. So regarded, the sum of $223.78 should be treated as a cost to Phillips, increasing his total cost to $21,584.27, which results in gain to him of $5,389.51 from the cash surrender value of

the policy on March 7, 1952, of $26,973.78. Looking through form to substance, the holding here should be that on March 7, 1952, Phillips realized ordinary income in the amount of $5,389.51, and respondent's determination should be sustained. If the above conclusion about petitioner's cost represents an adjustment in respondent's computation we can and should make such adjustment. *Gregory* v. *Helvering, supra* at 811.

The transaction with Barker and Reid, undertaken when the Connecticut Mutual policy (or contract) was about to mature and when it had a cash surrender value of only $26.22 less than the principal amount, should not be recognized as a sale of the policy under the doctrine of the following authorities: *Lucas* v. *Earl, supra; United States* v. *Phellis*, 257 U. S. 156; *Corliss* v. *Bowers*, 281 U. S. 376, 378; *Griffiths* v. *Helvering*, 308 U. S. 355; *Helvering* v. *Horst, supra; Helvering* v. *Eubank*, 311 U. S. 122; *Macqueen Co.* v. *Commissioner*, 67 F. 2d 856; *Hale* v. *Helvering*, 85 F. 2d 819, 821; *Helvering* v. *Smith*, 90 F. 2d 590, 592; *United States* v. *Fairbanks*, 95 F. 2d 794; *Felin* v. *Kyle*, 102 F. 2d 349. Cf. *United States* v. *Virgin*, 230 F. 2d 880. In the *Macqueen* case the form of a transaction was a sale but the substance was not, and the question of the amount of the tax was determined on the basis of the substance of the transaction. The reasoning of the *Hale* and the *Smith* cases, cited above, is pertinent here. The principle of *Lucas* v. *Earl* should not be put aside under the facts of this case.

The conclusion which in my opinion cannot be escaped here might be different where a policy was not about to mature, or did not have a cash surrender value in an amount close to the full value at maturity, and where the taxpayer could recover his investment only through a sale to a third party. But here, the petitioner's arrangement was no more than the adoption of a convenient intermediary step prior to the surrender of the policy to the obligor under the policy, which was not necessary from a practical viewpoint and which served no business purpose. Petitioner's effort to substitute Barker and Reid for Connecticut Mutual as the payor of the sum accrued and due under the policy should not be given any effect and should not be recognized. And, the consideration of the issue should not be confused by the point that the so-called dividends paid under a policy by a mutual company constitute a return of premiums paid and, therefore, serve to reduce the taxpayer's cost of the policy. The so-called dividends and their treatment may constitute something of a detriment to the taxpayer when the final accounting with the taxing authorities must be made, but such is the toll exacted by the far-reaching sweep of section 22 (a), and its reach cannot be avoided by neatly conceived anticipatory arrangements with agreeable parties.

I respectfully dissent from the holding that the arrangement with Barker and Reid constituted "a real and bona fide sale," and from the view that such authorities as *Gregory* v. *Helvering*, and others relied on by respondent, and others above cited do not apply here.