*Decision will be entered under Rule 50.*

HARRY ROFF AND MARCIA ROFF, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 68200. Filed August 10, 1961.

*Jerome R. Miller, Esq.*, for the petitioners.
*Arthur Pelikow, Esq.*, for the respondent.

BRUCE, *Judge:* Respondent determined deficiencies in Federal income taxes for the years 1954 and 1955 in the amounts of $2,232.98 and $1,044.77, respectively. The issues presented for our determination are: (1) Whether increments realized upon the sale of annuity policies are taxable as ordinary income or as long-term capital gain;

and (2) if said increments are taxable as ordinary income, whether the provisions of section 72, I.R.C. 1954, are applicable.

The stipulated facts are so found and are incorporated herein by this reference.

Harry Roff, hereinafter referred to as petitioner, and Marcia Roff are husband and wife residing in Maplewood, New Jersey. Their joint income tax returns for the years 1954 and 1955 were timely filed with the district director of internal revenue at Newark, New Jersey.

At all times material hereto, petitioner was in the tire business and was not a dealer in annuities, life insurance policies, or securities.

On December 22, 1934, the Connecticut Mutual Life Insurance Company issued to the petitioner its policy No. 848,774, a so-called guaranteed endowment annuity, under which Connecticut Mutual agreed to pay petitioner an income for life of $153.10 per month beginning on December 22, 1954 (the maturity date), in consideration of the payment on December 22, 1934, of an annual premium, and of like annual premiums thereafter until 20 annual premiums shall have been paid. The cash value at maturity was listed as $26,480. Connecticut Mutual agreed, subject to petitioner's power to change any beneficiary, to pay to "Lena Roff, mother of the Annuitant, if she survive him, if not, to his executors, administrators or assigns" death benefits as follows:

(a) in event of the death of the Annuitant after the maturity date but before the total of the annuity payments made, as herein provided, shall have amounted to the Cash Value at Maturity * * *, to pay the excess of such cash value over the total annuity payments made; (b) in event of the death of the Annuitant before the maturity date, to pay the cash value as specified herein for the end of the contract year current at date of death, or the sum of the premiums paid hereon if such sum be greater than the cash value. * * *

The policy further provided that:

The right to receive all cash values, loans, dividends and other benefits accruing hereunder, to change the beneficiary, to exercise all privileges and options contained herein, and to agree with the Company to any release, modification or amendment of this contract, shall, unless herein otherwise specifically provided, belong and be available without the consent of any other person, to the Annuitant or his assigns.

\* \* \* \* \* \* \*

*The Dividend.* This contract, upon the payment of the second annual premium and during its continuance thereafter until the maturity date as a premium-paying or paid-up contract, will participate annually in the divisible surplus which shall be determined and apportioned by the Company.

The dividend shall at the option of the payee thereof be

(1) paid in cash, or

(2) left with the Company, subject to withdrawal, to accumulate at such rate of interest, credited annually at not less than 3%, as the Company may determine, or

(3) applied on a premium due hereon.

If the Company be not otherwise directed in writing prior to the expiration of thirty-one days after such dividend becomes payable, the dividend shall be treated as above provided under option (2).

Any dividend accumulation to the credit of this contract at its maturity date may be then applied to increase the annuity otherwise payable in the proportion that such accumulation bears to the then cash value of this contract. Any dividends due and unpaid at the death of the Annuitant shall be payable to the beneficiary.

*Automatic Payment of Premium by Accumulated Dividends.* If any premium or instalment of premium be not paid as herein provided, and if there be at the expiration of the time herein provided for such payment accumulated cash dividends credited on account of this contract at least equal to the payment required, then said payment shall be made by the application of an equal amount of such credit, or if such credit be less than the required payment then out of such credit, if sufficient, shall be paid a semi-annual or quarterly instalment of the annual premium.

\* \* \* \* \* \* \*

*Assignments.* No assignment of this contract shall be binding upon the Company until the original or a copy thereof is filed at the Home Office of the Company in Hartford, Connecticut. The Company will not be responsible for the validity of any assignment.

*Reserves.* The reserves on this contract are based upon the Combined Annuity Mortality Table and $3\frac{1}{2}\%$ compound interest.

\* \* \* \* \* \* \*

*Cash Value.* At any time after due payment of two or more full annual premiums hereon, and on or before the maturity date or within thirty-one days thereafter, on surrender of this contract, the Company will pay the cash value of this contract in full settlement of its liability hereunder; provided that the Company may defer such surrender and payment for a period not exceeding sixty days after application therefor.

Such Cash Value shall be as follows:

(1) If there shall have been no failure to pay premiums as provided in this contract the cash value, per $100 unit of annual premium exclusive of any disability premium, at the end of each contract year prior to the maturity date shall be as specified in the Table of Cash Values herein; a proportionate adjustment to be made on account of the payment of any additional instalment of an annual premium in excess of full annual premiums; and the cash value at any date other than the end of a contract year to be the cash value at the end of the term covered by the then current annual premium or instalment thereof, discounted at the rate of 5% per annum. If there shall have been no failure to pay premiums as provided in this contract, the Cash Value at the maturity date shall be as specified on the first page hereof.

(2) If this contract shall have become a paid-up annuity through a default in premium payment, the cash value shall be the cash value at date of default accumulated at $3\frac{1}{2}\%$ interest compounded annually to the date of surrender, provided, however, that in any case such cash value shall be decreased by any existing indebtedness to the Company on or secured by this contract.

\* \* \* \* \* \* \*

## OPTIONAL SETTLEMENTS

\* \* \* \* \* \* \*

*Option 3. Proceeds at Interest.* Interest earnings upon the proceeds payable annually, semi-annually, quarterly, or monthly at such rate as shall from time

to time be determined and thereto apportioned by the Company, but at a rate not less than 3% per annum, during the lifetime of the payee or for a shorter fixed period, as may be specified in said agreement.

Petitioner paid total premiums of $18,742.25 on the Connecticut Mutual policy. As of December 22, 1954, the total cash surrender value of said policy was $26,813.54, including accumulated dividends of $263.40 and interest thereon of $70.14.

On December 14, 1954, petitioner executed an assignment of all his "right, title and interest in and to" said policy to Sydney A. Gutkin, his tax attorney, for a consideration of $26,813.54. A copy of the assignment contract, which was executed on an insurance company form, was received by the home office of Connecticut Mutual on December 17, 1954. Payment of the $26,813.54 was in the form of a check dated December 23, 1954, which cleared the bank on the same day.

On December 22, 1954, upon Gutkin's election to take the interest option, an interest income contract was issued by Connecticut Mutual to Gutkin guaranteeing to pay interest to him. In August of 1956 Gutkin surrendered his interest income contract to Connecticut Mutual for $26,828.07.

On May 1, 1936, the Prudential Insurance Company of America issued to the petitioner its policy No. 9,368,199, a retirement annuity policy, which provided for the payment to petitioner of monthly installments of $130.10 for 120 months certain and thereafter during the lifetime of the annuitant, commencing 19 years after the date of said policy. The death benefit provision named petitioner's mother as beneficiary. The policy further provided for annual premiums of $1,000, the first to be paid on delivery of the policy and subsequently on the first day of May in every year during the continuance of the policy until the due date of the first annuity payment.

Prudential policy No. 9,368,199 contained the following clauses material hereto:

*Change of Beneficiary.*—If the right to change the Beneficiary has been reserved, the Annuitant may at any time while this Policy is in force, by written notice to the Company at its Home Office, change the Beneficiary or Beneficiaries under this Policy, such change to be subject to the rights of any previous assignee and to become effective only after a provision to that effect has been endorsed on or attached to the Policy by the Company, whereupon all rights of the former Beneficiary or Beneficiaries shall cease.

*Change in Policy.*—The Annuitant and the Company may agree upon a change in the mode of settlement provided for in this Policy or upon a change in plan or upon a change to an insurance policy on the life of the Annuitant, and to any such change the consent of any Beneficiary, unless irrevocably designated, shall not be necessary.

*Assignments.*—Any assignment of this Policy must be in writing, and the Company shall not be deemed to have knowledge of such assignment unless the original or a duplicate thereof is filed at the Home Office of the Company. The Company will not assume any responsibility for the validity of an assignment.

\*　　\*　　\*　　\*　　\*　　\*　　\*

*Basis of Reserve.*—The reserve upon this Annuity Policy for which funds are to be held shall be based upon compound interest at the rate of three and one-quarter per cent. per annum during the period prior to the date upon which the first instalment of the Annuity is payable, and thereafter the reserve shall be based upon the American Annuitant's Select Male Table, females being regarded as four years younger than the actual age, with three and one-quarter per cent. per annum compound interest, provided, however, that in no event shall such reserve be less than that required by the laws of the State in which this Policy is issued.

\*       \*       \*       \*       \*       \*       \*

*Annual Dividends.*—Annually, during its continuance in force prior to the due date of the first monthly payment of an Annuity hereunder, any proportion of the divisible surplus accruing on this Policy shall be ascertained and apportioned to this Policy as a dividend by the Board of Directors. (See "Notice to Policyholder" below.) Such dividend shall be (1) paid in cash, or (2) applied to the reduction of any premium then due; or upon written request of the Annuitant it may be (3) left to accumulate to the credit of the Policy with interest compounded annually at the rate of three per cent., plus such additional interest, if any, as the Company may declare on such funds, and payable when the first monthly payment of the Annuity has become due, or withdrawable in cash on any anniversary of the Policy prior thereto. If the Annuitant selects no other dividend option the dividend shall be paid in cash.

\*       \*       \*       \*       \*       \*       \*

*Cash Surrender Value.*—If this Policy is continued in force by the due payment of premiums for at least one year, the Annuitant, by written application and return of the Policy to the Home Office of the Company at any time but not after three months from the due date of any premium in default, may elect, subject to the consent of any irrevocable beneficiary, to surrender this Policy for its net Cash Surrender Value. The net Cash Surrender Value of this Policy at the end of any policy year shall be the tabular Cash Surrender Value indicated in the following table less any indebtedness on account of this Policy existing at the end of such policy year. In computing such tabular Cash Surrender Value from the said table due allowance will be made on account of any fractional part of a year for which premiums have been paid. The Company reserves the right to defer the payment of any Cash Surrender Value for the period permitted by law but not exceeding six months after application for such Cash Surrender Value.

Petitioner paid total premiums of $18,084.86 with respect to the Prudential policy. As of its maturity date, May 1, 1955, its total cash surrender value was $22,180.59, including accumulated dividends of $83.40 and interest thereon of $47.19.

On April 22, 1955, petitioner executed an assignment of the Prudential policy to Sydney A. Gutkin. By rider dated April 25, 1955, attached to and made a part of policy No. 9,368,199, Gutkin was made the beneficiary of said policy. By rider dated April 25, 1955, the policy was amended to provide that—

all legal incidents of ownership and control of the Policy, including any and all benefits, values, rights, options and privileges conferred upon the Annuitant by the Policy or allowed by the Company shall belong to [Sydney A. Gutkin] \* \* \*.

PROVIDED that, anything in the Policy to the contrary notwithstanding, if the

Policy is surrendered for its cash surrender value or matures as an endowment, any Provisions as to Modes of Settlement otherwise applicable to the Policy shall not be available to said Owner and, if the Policy provides for periodic payment of instalments upon maturity as an endowment, then, in lieu thereof, the cash value of the Policy as of the date the Policy matures as an endowment shall be payable immediately in one sum. * * *

Petitioner assigned the Prudential policy to Gutkin for a consideration of $21,250. Gutkin's check for said amount, dated April 11, 1955, cleared the bank on April 25, 1955. Shortly after the policy's maturity date, Gutkin surrendered the policy to Prudential for its then value, $22,180.59.

The Connecticut Mutual and Prudential policies were both annuity contracts.

The reserves or cash surrender values of the Connecticut Mutual and Prudential policies were accumulated at interest rates of 3½ percent and 3¼ percent, respectively, both compounded annually.

Respondent determined that petitioner realized ordinary taxable income from the assignment of the Connecticut Mutual and Prudential annuity policies in the years 1954 and 1955, respectively.

The excess of the proceeds received upon the sales of the Connecticut Mutual and Prudential policies over the total premiums stipulated as having been paid thereon, respectively, constitutes ordinary income.

OPINION.

Shortly prior to their respective maturity dates, petitioner, Harry Roff, transferred to a third party two annuity contracts. He contends the transfers constituted bona fide sales of capital assets and that he is entitled to have the excess of sales price over net cost taxed at capital gains rates. Respondent maintains that the so-called sales were not bona fide and that, even if they were bona fide, petitioner cannot thereby convert into capital gains what would otherwise be ordinary income.

Petitioners transferred to a purchaser for value all rights, title, and interest in the contracts, retaining no control thereover. We agree with petitioner that the transfers constituted bona fide sales of the annuity contracts in question. *Arnfeld* v. *United States*, 163 F. Supp. 865 (Ct. Cl. 1958), certiorari denied 359 U.S. 943. Cf. *Percy W. Phillips*, 30 T.C. 866, reversed on other grounds 275 F. 2d 33 (C.A. 4, 1960), wherein we held such a transfer of an endowment insurance contract constituted a bona fide sale. That the taxpayer's purpose was to achieve capital gains treatment does not destroy the bona fides of the sale. *Gregory* v. *Helvering*, 293 U.S. 465 (1935). Characterization of the transfers as "accommodation purchases" make them no less "sales." *John D. McKee*, 35 B.T.A. 239. We agree with respondent, however, that such sales resulted in ordinary income to the petitioner.

We are concerned with two so-called annual-premium, deferred-annuity contracts, one issued by Connecticut Mutual Life Insurance Company, the other by Prudential Life Insurance Company. Each provided for an annual premium of $1,000. With respect to each, premium reductions were allowed to petitioner, Harry Roff, for prepayment of premiums.

Connecticut Mutual applied an interest rate of 3½ percent, compounded annually, to the effective rate of premium payments, i.e., total annual premium of $1,000 as reduced by $125 for administrative costs. Prudential applied a rate of 3¼ percent, compounded annually, to $1,000 less $170 for administrative costs. Because of the interest provided for by the contracts, the cash surrender values thereof, both at the dates of the sales and at the maturity dates, were in excess of the total premiums called for by the policies, and paid by Harry Roff.

It is clear, therefore, that the gains reaped by petitioner on the sales of the contracts, are attributable to interest accumulated under the contracts at fixed and predictable rates.[1] Upon surrender of the policy, or receipt of annuity payments after maturity, petitioner would have been taxed on the gain as ordinary income. Sec. 72, I.R.C. 1954; cf. *Bodine* v. *Commissioner*, 103 F. 2d 982 (C.A. 3, 1939), certiorari denied 308 U.S. 576.

Accordingly, the issue before the Court is whether, through a bona fide sale, petitioner may convert this otherwise ordinary income into capital gains. We agree with petitioner that the contracts constituted capital assets held for more than 6 months, but this is not dispositive of the issue. Even though the property falls within the general definition of a capital asset, the sale under scrutiny may include the sale of certain ordinary income portions which will be taxed at ordinary rates. *Fisher* v. *Commissioner*, 209 F. 2d 513 (C.A. 6, 1954), affirming 19 T.C. 384; *United States* v. *Snow*, 223 F. 2d 103 (C.A. 9, 1955). In *United States* v. *Snow*, *supra* at 108, the court stated that "the assignment of accrued ordinary income must be treated separately from the assignment of the capital asset which produced the income."

We see no reason to treat the gains in the instant case differently from those in the cases cited above. Petitioner received the equivalent of interest on the sales of the contracts. Thus, this case is indistinguishable from *Arnfeld*, in which the Court of Claims held that by a bona fide sale of an annuity contract 3 days prior to the maturity

---

[1] The stipulation of facts states that the total premiums paid on the Connecticut Mutual and Prudential contracts were $18,742.25 and $18,084.86, respectively. Testimony elicited from a representative of Connecticut Mutual evidences the fact that the stipulated amount paid on the Connecticut Mutual contract includes "dividends" of $263.40. While there is no specific testimony thereof, with respect to the Prudential policy, the record bears the inference that the stipulated amount paid on this contract includes $83.40 in dividends. Likewise, the stated cash surrender values of the policies include the dividends paid thereon with accumulated interest. Since dividends have been added both to cost and cash surrender values, the amounts realized are attributable solely to interest.

thereof, plaintiffs could not "convert what would in time constitute ordinary income * * * into capital gain."

Our decision in *Percy W. Phillips, supra,* does not require a different conclusion. That case involved the sale of an endowment insurance policy which provided life insurance protection, whereas the annuity contracts here involved did not provide life insurance protection. The gain realized with respect to the endowment insurance policy in the *Phillips* case was due in large part to the favorable mortality experience of the insurance company, as well as its investment practice. The gain realized with respect to the annuity contracts involved is due entirely to interest earnings. While the Court of Appeals, in reversing our decision in the *Phillips* case, found no controlling difference between the *Arnfeld* and *Phillips* cases, we do not deem it necessary in the instant case, to express any view with respect to the Fourth Circuit's opinion in the *Phillips* case.

On reply brief, petitioner has argued that the issue of anticipatory assignment of accrued interest is not properly before the Court. We have examined the pleadings and are satisfied that the statutory notice of deficiency and pleadings as a whole place this matter in issue.

We hold that the petitioner realized ordinary income rather than capital gain upon the sale of the annuity contracts involved herein.

Petitioner contends, alternatively, that if the gains realized on the sales constitute ordinary income, then such gains should be included in petitioner's gross income ratably in the year of receipt and the 2 preceding taxable years, pursuant to section 72(e)(3), I.R.C. 1954.[2]

---

[2] SEC. 72. ANNUITIES; CERTAIN PROCEEDS OF ENDOWMENT AND LIFE INSURANCE CONTRACTS.

(e) AMOUNTS NOT RECEIVED AS ANNUITIES.—

(1) GENERAL RULE.—If any amount is received under an annuity, endowment, or life insurance contract, if such amount is not received as an annuity, and if no other provision of this subtitle applies, then such amount—

(A) if received on or after the annuity starting date, shall be included in gross income ; or

(B) if subparagraph (A) does not apply, shall be included in gross income, but only to the extent that it (when added to amounts previously received under the contract which were excludable from gross income under this subtitle or prior income tax laws) exceeds the aggregate premiums or other consideration paid.

For purposes of this section, any amount received which is in the nature of a dividend or similar distribution shall be treated as an amount not received as an annuity.

(2) SPECIAL RULES FOR APPLICATION OF PARAGRAPH (1).—For purposes of paragraph (1), the following shall be treated as amounts not received as an annuity :

(A) any amount received, whether in a single sum or otherwise, under a contract in full discharge of the obligation under the contract which is in the nature of a refund of the consideration paid for the contract ; and

(B) any amount received under a contract on its surrender, redemption, or maturity.

In the case of any amount to which the preceding sentence applies, the rule of paragraph (1)(B) shall apply (and the rule of paragraph (1)(A) shall not apply).

(3) LIMIT ON TAX ATTRIBUTABLE TO RECEIPT OF LUMP SUM.—If a lump sum is received under an annuity, endowment, or life insurance contract, and the part which is includible in gross income is determined under paragraph (1), then the tax attributable to the inclusion of such part in gross income for the taxable year shall not be greater than the aggregate of the taxes attributable to such part had it been included in the gross income of the taxpayer ratably over the taxable year in which received and the preceding 2 taxable years.

826

Section 72(e) provides specifically for lump-sum amounts "received under an annuity * * * contract." Nothing in this section or in the congressional comments thereon (see H. Rept. No. 1337 and S. Rept. No. 1622, to accompany H.R. 8300 (Pub. L. 591), 83d Cong., 2d Sess., both at p. 11 (1954)) justifies application of the section to amounts not received "under an annuity * * * contract." Clearly, the amounts received on the sales of the contracts here involved were not so received. The section is applicable to lump-sum payments made by the insurer in discharge of all contractual obligations. See 1 Mertens, Law of Federal Income Taxation, sec. 6A.07, p. 22.

*Decision will be entered under Rule 50.*