*Decisions will be entered under Rule 50.*

HALLCRAFT HOMES, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 92138. Filed April 30, 1963

*Sidney R. Reed,* for the petitioner.
*L. Justin Goldner,* for the respondent.

DRENNEN, *Judge:* Respondent determined a deficiency in petitioner's income tax for its fiscal year ending April 30, 1958, in the amount of $15,309.98. The only issue is whether the income realized by petitioner from the transfer of refundable water contracts to the city of Phoenix was taxable as ordinary income or as long-term capital gain from the sale or exchange of capital assets.

FINDINGS OF FACT

The stipulated facts are so found.

Petitioner is an Arizona corporation, incorporated in 1952 to succeed a partnership established by John C. Hall and his father, M. D. Hall, with its principal office and place of business in Scottsdale, Ariz. It filed its corporate income tax return, on the accrual basis, for its fiscal year ending April 30, 1958, with the district director of internal revenue at Phoenix, Ariz.

Petitioner, all of whose stock was owned equally by John C. Hall and M. D. Hall, is in the business of constructing residences in and about Phoenix, Ariz. In the ordinary course of its business, petitioner would purchase raw land which it developed by improvements such as streets, water mains, and dwelling houses. The houses were actually constructed by corporations affiliated with petitioner, under

contract. Thereafter petitioner sold the finished houses and lots to private individuals. Generally, financing for the purchase of these houses was obtained through the Federal Housing Administration or lending agencies.

In the ordinary course of its business, petitioner would enter into agreements with water companies to construct waterline extensions to furnish water to the houses being constructed by petitioner in its various subdivisions. These agreements provided that petitioner would advance to the particular water company the funds for extending the water system to petitioner's subdivisions and to the individual houses. The work was done by the water companies and title to the lines, meters, etc., was in the water companies. Under these agreements the funds advanced by petitioner were to be repaid by the water companies out of the proceeds of sale of water to the homeowners to the extent of 22 percent of receipts over a period not to exceed 20 years. Upon refund of the entire amount advanced, no further payments were to be made to petitioner, and if the entire amount advanced had not been refunded to petitioner from water revenues by the end of 20 years, the balance was to be paid to petitioner by the water companies in a lump sum. No interest was to be paid on the funds advanced by petitioner. These agreements were duly carried out.

Under six separate agreements similar to those described above, entered into with the following water companies on the dates indicated, to provide water to six separate subdivisions developed by petitioner containing a total of 601 houses, petitioner advanced a total of $113,707 to the water companies:

| Name of water company | Date of agreement |
|---|---|
| 1. Suburban Pump & Water Co. | Nov. 30, 1955 |
| 2. Valley Water Co. | June 21, 1956 |
| 3. Valley Water Co. | Oct. 3, 1956 |
| 4. Valley Water Co. | Nov. 28, 1956 |
| 5. Valley Water Co. | Mar. 29, 1957 |
| 6. Valley Water Co. | May 29, 1957 |

All of the houses had been sold by petitioner by May 1, 1957, and there were no unsold houses in these subdivisions on that date. Neither the petitioner, nor John C. Hall or any member of his family, had any interest in either of the above water companies.

Prior to September 6, 1957, petitioner was approached by a representative of the city of Phoenix, Ariz., who proposed that petitioner grant the city options, exercisable on or before January 15, 1958, which would give the city the right to acquire petitioner's right to the refunds from the water companies. Petitioner accepted the proposal and executed six option agreements, each dated September

6, 1957, granting the city of Phoenix the option "to assume the obligations of the Agreement [the waterline extension agreements with the water companies] and to pay to the Subdivider [petitioner]" specified sums of money on or before January 15, 1958. The sums specified in each option were 50 percent of the unrefunded advances made by petitioner to the water company for the particular subdivision.

The six options were duly exercised by the city of Phoenix on January 2, 1958, resulting in a payment to petitioner of $56,703.63 on March 31, 1958, for its entire interest in the unpaid balance due on the six water contracts. The $56,703.63 amounted to one-half the unrecovered balance due to petitioner from the water companies.

By agreement dated November 18, 1957, the city of Phoenix bought all the water utility properties of three water companies, including Suburban Pump & Water Co. and Valley Water Co. As a part of the consideration for the properties the city assumed and agreed to pay all of the refundable waterline agreements entered into by the water companies.

Petitioner recorded the amounts of refunds it received from various water companies, both prior to and subsequent to its fiscal year 1958, in its general ledger account entitled "Water Revenue Income." The credits to this account for its fiscal year 1958 totaled $76,952, including the $56,703.63 paid to it by the city. As of April 30, 1958, it carried the $76,952 to profit and loss, bringing the water revenue account down to zero. This account was closed out to profit and loss each year. Prior to 1958 petitioner included the entire amount of these refunds in ordinary income for tax purposes. On its income tax return for fiscal 1958 it reported the $56,703.63 received from the city as long-term gain from the sale or exchange of capital assets, with a basis of zero, and reported the balance of $20,248.37 as ordinary income. Subsequent to 1958 petitioner included all refunds from water companies in ordinary income. The transaction with the city of Phoenix above described was the only occasion on which petitioner transferred its right to receive refunds from the water companies.

In its income tax returns for fiscal years ending prior to 1958 petitioner had deducted the amount of its advances to the water companies as an expense in computing its cost of sales.

In its fiscal year 1958 petitioner's gross sales, as indicated on its tax return, were $9,830,490.65. Its reported net income was $583,-497.80 on which it paid an income tax of $270,909.76. On April 30, 1957, petitioner had cash in the amount of $58,769.52 and on April 30, 1958, petitioner had cash in the amount of $34,767.46. On April 30, 1958, petitioner had liabilities in the amount of $1,196,248.12, consisting principally of the following in the approximate amounts as fol-

lows: Accounts payable, $235,000; contracts payable, $110,000; mortgages payable, $463,000; accrued interest, $52,000; Federal and State income taxes payable, $286,000.

Saving of income taxes was not a dominant purpose in petitioner's transfer of the above-mentioned refundable waterline extension contracts to the city of Phoenix.

In his notice of deficiency respondent determined that the $56,703.63 received by petitioner from the city was ordinary income and not capital gain for the reasons that no sale or exchange was effected by the execution of the option within the purview of section 1222(3) of the 1954 Code, and further that petitioner realized ordinary income upon the receipt of that sum "in full satisfaction of the obligations."

### OPINION

The only issue is whether the amount received by petitioner on its transfer to the city of Phoenix of the waterline refund agreements is taxable as ordinary income or capital gain.

Petitioner argues (1) that the water refund agreements were property rights and, not falling within one of the exclusions in section 1221, I.R.C. 1954,[1] were capital assets, (2) that the agreements were held by petitioner for more than 6 months, (3) that the transfer to the city of Phoenix, a stranger to the agreements, constituted a sale, and (4) that the sale was not motivated by tax avoidance; and therefore the amount received by petitioner is taxable as long-term capital gain. We agree with petitioner on all except its first point, but we believe that is fatal to its case. There is no dispute that the agreements were held by petitioner for more than 6 months, and we are convinced from the evidence that the transfer of the agreements to the city was a bona fide sale made at arm's-length for what petitioner's management considered to be a sound business purpose, which was not primarily motivated by tax avoidance. We accept the explanation of petitioner's president that he felt it was more important to petitioner's expanding business to obtain the immediate use of cash representing

---

[1] All references are to the 1954 Code.
SEC. 1221. CAPITAL ASSET DEFINED.

For purposes of this subtitle, the term "capital asset" means property held by the taxpayer (whether or not connected with his trade or business) but does not include—

(1) stock in trade of the taxpayer or other property of a kind which would properly be included in the inventory of the taxpayer if on hand at the close of the taxable year, or property held by the taxpayer primarily for sale to customers in the ordinary course of his trade or business;

(2) property, used in his trade or business, of a character which is subject to the allowance for depreciation provided in section 167, or real property used in his trade or business;

(3) a copyright, a literary, musical, or artistic composition, or similar property * * *

* * * * * * *

(4) accounts or notes receivable acquired in the ordinary course of trade or business for services rendered or from the sale of property described in paragraph (1); or

(5) an obligation of the United States or any of its possessions * * *

50 percent of the total refunds due than to wait 20 years to obtain the entire amount a little bit at a time. We also recognize that it was probably sound business for petitioner to cooperate with the city in acquiring these water systems.

It would also appear on the surface that the refund agreements technically fall within the definition of capital assets contained in section 1221 of the Code. Respondent points to none of the exceptions in the definition within which these agreements would fall and we cannot say that they do fall squarely within any one of them. But the courts have long held that not everything that has the outward appearance of a capital asset qualifies as a capital asset for purposes of the capital gains provisions.

In *National Bank of Commerce* v. *Commissioner*, 115 F. 2d 875 (C.A. 9, 1940), affirming 40 B.T.A. 72 (1939), it was held that notes held by a bank which represented loans of capital but which had been charged off against ordinary income were no longer capital assets for tax purposes. Subsequent recoveries thereon were held to be taxable as ordinary income on the theory that for tax purposes the profit which the chargeoffs had offset replaced the capital loaned so the debt itself lost its nature as capital, and the recoveries represented the profit or income which had escaped taxation. See also *Merchants Nat. Bank* v. *Commissioner*, 199 F. 2d 657 (C.A. 5, 1952), affirming 14 T.C. 1375 (1950), in which this Court distinguished *Conrad N. Hilton*, 13 T.C. 623 (1949), a case relied on by petitioner here.

In *Commissioner* v. *P. G. Lake, Inc.*, 356 U.S. 260 (1958), the Supreme Court held that an assignment of a carved-out oil payment for a lump-sum consideration produced ordinary income rather than capital gain because the substance of what was assigned was the right to receive future income and the consideration paid was for the right to receive future income and not for an increase in the value of the income-producing property. In *Nat Holt*, 35 T.C. 588 (1961), affd. 303 F. 2d 687 (C.A. 9, 1962), this Court held that a lump-sum payment received for termination of a contract right to participate in the future profits from motion pictures was taxable as ordinary income. We found that the participation interest represented compensation for services rendered and that the substitution of a lump-sum payment for the right to receive income in the future did not convert what would otherwise have been taxable as ordinary income into capital gain even though the participation interests might in the abstract be deemed property rights. And in *Harry Roff*, 36 T.C. 818 (1961), affirmed per curiam 304 F. 2d 450 (C.A. 3, 1962), we held that the sale of a deferred annuity contract a few days before it matured resulted in ordinary income to the extent the sales price exceeded the premium paid, saying: "Even though the property falls within the

general definition of a capital asset, the sale under scrutiny may include the sale of certain ordinary income portions [interest] which will be taxed at ordinary rates."

In *Corn Products Co. v. Commissioner*, 350 U.S. 46 (1955), the Supreme Court held that while the taxpayer's corn futures did not fall within the literal language of any of the exclusions contained in the statutory definition of capital assets, taxpayer's profits on the sale thereof were nevertheless taxable as ordinary income, stating that the capital gains provisions of the Code must not be so broadly applied as to defeat rather than further the purpose of Congress. The Court found that Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income or loss rather than capital gain or loss. The preferential treatment provided by the capital gains provisions apply to transactions in property which are not the normal source of business income, and was intended to relieve taxpayers from excessive tax burdens on gains resulting from a conversion of capital investments. The Court concluded that the taxpayer's hedging transactions were engaged in in the normal course of its everyday business activity to assure itself of a supply of inventory at a reasonable cost, and that the profits realized thereon were ordinary business income. Similarly in *Electrical Fittings Corporation*, 33 T.C. 1026 (1960), this Court held that the taxpayer's loss on the sale of stock in a corporation it had formed jointly with others to assure itself of a supply of items used in its business during a period when that supply was short was an ordinary loss. We reasoned that the tax treatment of a loss on the sale of stock, which had the appearance of a capital asset, depends on the purpose for which the taxpayer acquired the stock. If the stock was purchased as an investment it was a capital asset and gain or loss on the sale thereof was capital gain or loss. But if the stock was purchased in the ordinary course of taxpayer's business for the sole purpose of insuring for itself a source of vital inventory, it was not a capital asset. And see *Estate of Grace M. Scharf*, 38 T.C. 15 (1962), affd. 316 F. 2d 625 (C.A. 7, 1963).

The above are some of the situations in which the courts have held that what appeared on the surface to be a capital asset was not a capital asset for purposes of the capital gain and loss provisions. We believe we must analyze the agreements here involved in the light of what was said in the opinions in those cases.

Here, in order to complete its houses so they could be sold in the ordinary course of its business petitioner was required to advance to the water company the cost of extending water service to those houses. The water company agreed to repay petitioner these advances over a 20-year period out of its sales of water to the eventual owners of the

houses. In accordance with the decision of this Court in *Albert Gersten*, 28 T.C. 756 (1957), remanded on other grounds 267 F. 2d 195 (C.A. 9, 1959), petitioner added the amount of the advances to the cost of houses sold in computing its income from the sale of the houses. The amount advanced thereby offset ordinary income, as in *National Bank of Commerce* v. *Commissioner*, *supra*. Petitioner agrees that the refunds received *from the water companies* are taxable as ordinary income, and it has so reported them prior to, subsequent to, and, in fact, during the year here involved. See *Chevy Chase Land Co.*, 34 B.T.A. 150 (1936). But petitioner claims the refunds are taxable as ordinary income only because there was no sale or exchange; whereas the amount here involved was received on the sale of those particular agreements. We do not understand that distinction to be the basis for the decisions in the two bank cases cited above. Petitioner's advances of "capital" to the water companies were replaced by the profits on the sale of the houses that were offset by the deductions, just the same as in the bank cases, and under the theory of those cases the replacement of those advances, whether by refund or sale, would represent a replacement of profit or ordinary income and would be taxable as such.

Petitioner's advances under these agreements could hardly be classified as an investment with the expectation of profit from the increment in value of the properties invested in. Petitioner could never recover more than it advanced; and the advances drew no interest. The only profit petitioner could anticipate on these advances was the profit from the sale of the houses in the ordinary course of its business—which would be ordinary income.

All the agreements represented was the right to receive income in the future, which petitioner agrees would have been taxable to it as ordinary income if received from the water companies. We do not think the substitution of an immediate lump-sum payment for that right should change the character of the income from ordinary income to capital gain. *Commissioner* v. *P. G. Lake, Inc.*, *supra*, and cases cited above in conjunction therewith. The agreements did not represent an interest in property which might increase in value, as was the situation in *Dorman* v. *United States*, 296 F. 2d 27 (C.A. 9, 1961); *Anton L. Trunk*, 32 T.C. 1127 (1959); *Henrietta B. Goff*, 20 T.C. 561 (1953), affd. 212 F. 2d 875 (C.A. 3, 1954), certiorari denied 348 U.S. 829 (1954), and other cases relied on by petitioner.

And, finally, the refund agreements were acquired by petitioner in the normal course of its everyday business activity in order to make possible the sale of its houses at a profit, which would seem to bring the situation within the principle of *Corn Products Co.* v. *Commissioner*, *supra*, and similar cases. The advances were expenditures made in connection with the production of petitioner's normal business income.

Despite the fact that the refund agreements might have the superficial appearance of capital assets, as defined in section 1221 of the Code, we do not think they qualify in fact as capital assets the gain on the sale of which Congress intended to be afforded the preferential capital gains treatment.

For the reasons stated herein we conclude that the amount received by petitioner on the sale of the waterline refund agreements to the city of Phoenix is taxable as ordinary income.

*Decision will be entered for the respondent.*