COLUMBIAN NAT. FIRE INS. CO. v. UNITED STATES.

No. 42123.

Court of Claims.

Feb. 4, 1935.

William P. Smith, of Washington, D. C. (Elven T. Larson, on the brief), for plaintiff.

Guy Patten, of Washington, D. C., and Frank J. Wideman, Asst. Atty. Gen., for the United States.

Before BOOTH, Chief Justice, and GREEN, LITTLETON, WILLIAMS, and WHALEY, Judges.

GREEN, Judge.

Plaintiff seeks to recover $33,429.07, with interest, on account of income taxes alleged to have been overpaid by it for the year 1929 under the Revenue Act of 1928. A timely and proper claim for refund was filed and rejected.

It appears that the plaintiff is a fire insurance company organized under the laws of Michigan in 1911, began business in March, 1913, and its first policy was issued in that month. On November 1, 1922, the plaintiff took over the Columbian Fire Insurance Company of Indiana, and the assets and liabilities of that company were transferred to plaintiff's books as of the last day of that year. On August 19, 1929, a group of Cleveland bankers organized the Monarch Fire Insurance Company for the specific purpose of acquiring the business and assets of the plaintiff as the nucleus in a new company. The Monarch Company, acting through its brokers, in September and October, 1929, purchased 18,488 41/60 shares (out of a total of 26,000) of plaintiff's stock at the rate of $43 per share, paying therefor a total of $795,013.40. Having thus acquired the ownership of over 70 per cent. of plaintiff's stock, the Monarch Company obtained control of the plaintiff corporation, the same individual serving as president of both companies, and an agreement was made on behalf of plaintiff to sell all of its "property and assets, of whatsoever kind," to the Monarch Company in consideration of the payment to plaintiff of $1,118,000 and the assumption by the Monarch Company of all of plaintiff's liabilities. The plaintiff received this sum and caused it to be distributed to its stockholders, and all outstanding stock of the plaintiff corporation was retired and canceled, having been redeemed at $43 per share.

The plaintiff filed its income tax return for 1929 which disclosed a taxable net income of $310,941.27 and a tax liability of $34,203.54, which was duly paid. Included in its gross income was an item of $379,252.78 shown as "profit from sales of assets." The return set out the sale of its assets and business, as above stated, charged plaintiff with the $1,118,000 received in cash, and offset against the same the cost of the assets less the liabilities assumed. The amount of the net assets was stated in the return at $738,747.22, and this deducted from the price paid by the Monarch Company made the profit from the sale $379,252.78. The cost of the assets as shown in the return and used by the Commissioner in computing the tax did not include any amount for the value of good will on March 1, 1913.

The plaintiff filed a claim for refund of the entire tax for 1929 and interest thereon. This claim was based on several grounds as shown in finding 3. The first ground mentioned may be summarized by saying that it claimed that the return for the year 1929 in place of showing a profit of $379,252.78 should have set out a total loss of $589,601.34 composed of certain items to which we shall hereinafter refer. Amendments were filed to this claim alleging alternatively that in 1929 plaintiff sold its entire capital stock to the Monarch Fire Insurance Company of Cleveland, Ohio, for the sum of $1,118,000, and that as of that date the cost of the capital stock so sold was $1,640,640.09; and as a further alternative the plaintiff claimed that good will was sold at the same time to the Monarch Fire Insurance Company, which had a market value as of March 1, 1913, of not less than $500,000, for which the plaintiff was entitled to a credit as an asset.

Subsequently, a further amendment was filed to the original claim stating alternatively that the Monarch Fire Insurance Company in 1929 purchased from the stockholders of the plaintiff all of its capital stock for the sum of $1,118,000, that by reason thereof there was no sale of assets by the taxpayer, and no profit which should have been reported in its income tax return.

In addition to the matters stated above, the plaintiff included in its refund claim as a part of its net loss an item of "Consolidated expense 1922, $15,101.98." In the con-

sideration of the claim for refund this last item will be first taken up.

■ The evidence shows that in 1922 plaintiff acquired all the assets and liabilities of the Columbian Fire Insurance Company of Indiana including its obligations on fire insurance policies which it had issued. After the plaintiff had taken over the business of the Indiana company, it was considered advisable, for certain reasons not necessary to mention here, to reinsure a portion of the risks upon which the Indiana company had issued policies, and an insurance broker was paid $10,000 for effecting the reinsurance thereof with other companies. Plaintiff claims that in addition to this brokerage other expenses were incurred and paid during 1922 in connection with the so-called merger amounting to $5,101.98. The testimony in the case shows that this amount was made up of a number of smaller items some of which in the first instance may have been paid by the Indiana company. The evidence is not as clear as it might have been made with reference to this matter, but on the whole we are satisfied that plaintiff incurred expense in acquiring the assets of the Indiana company in the amount of $5,101.98 in addition to the brokerage fee which was incurred. The two items of expense, however, were of a very different nature. Without going into details, we may say that the items which made up the $5,101.98 were somewhat in the nature of organization expenses. They were costs which plaintiff was obliged to pay in order to carry out the transactions by which it acquired the assets of the Indiana company. The brokerage fee was paid for effecting the reinsurance of a portion of the insurance contracts acquired from the Indiana company evidenced by policies issued; it being considered that they belonged to a class which it was not desirable for the plaintiff to carry. The brokerage fee, being paid in order to get plaintiff's business in more satisfactory condition, was either an ordinary and necessary expense or it was a capital expenditure. We are inclined to think it was a capital expenditure, as the benefits obtained through it were permanent; but in either event we do not think it was part of the cost of the assets of plaintiff. If it was an ordinary expense, it should have been deducted in 1922. If it was a capital expenditure, no deduction can be allowed therefor. We are satisfied that the brokerage fee was not deductible as a loss on the sale of plaintiff's assets. On the other hand, if we are right in concluding that the item of $5,101.98 was a part of the cost of the assets acquired from the Indiana company it becomes properly deductible as a loss at the time the plaintiff finally sold all of its assets to the Monarch Company.

■ Of the other items of plaintiff's claim for refund only two are presented in argument. One relates to good will, and the other to commissions on the sale of stock.

It is urged on the part of plaintiff that the evidence shows that when plaintiff's assets were sold there was included a good will which on March 1, 1913, was worth not less than $250,000, and that the amount of this good will should have been included by the Commissioner in plaintiff's assets and considered in determining the gain or loss on the final sale thereof to the Indiana company. In this connection it should be said that although there is some mention in the claim for refund of an alternative claim that instead of a sale of the assets there was a sale of the stock of plaintiff to the Indiana company, this claim seems to have been abandoned and the plaintiff's counsel now practically concede that the transactions between the plaintiff and the Monarch Company amounted to a sale of all of the plaintiff's assets to that concern which assumed all of plaintiff's liabilities to the stockholders for the proceeds of the sale.

It will be observed that it is claimed that this good will existed on March 1, 1913, which was the date on which the plaintiff was authorized to commence business and the date when it did begin business as a corporation.

The evidence shows that a special feature of the plan on which plaintiff was organized was that of having an insurance company which would be owned and controlled by individuals with Catholic faith and would specialize in writing insurance on property owned by Catholics. A response to the idea was found among Catholics, both lay and clergy, and on July 26, 1911, plaintiff was organized with prominent Catholics as its officers and directors. The promoters of the company in selling its stock presented an appeal to Catholics generally, referring to the amount of insurance taken out by Catholics and the nature of the organization as showing certain advantages which would accrue to the company, and in the stock selling campaigns it was the practice of the salesmen to secure pledges of insurance to be taken out with the plaintiff. Between $30,000,000 and $40,000,000 worth of insurance was pledged prior to December

31, 1913, and from one-half to two-thirds of that amount was pledged prior to March 1, 1913, during the sale of the first issue of the stock. These pledges were generally fulfilled. The stock salesmen in addition to being paid a commission on the sale of the stock received a commission on the pledges taken.

It is urged on behalf of plaintiff, not only that the good will was acquired through these pledges so obtained, but that from the nature of the organization of the company, and the appeal which it would naturally make to people of the Catholic faith, that a valuable good will existed on March 1, 1913.

On behalf of the defendant it is contended that plaintiff acquired no good will and that if any was acquired the evidence entirely fails to show the value thereof.

There is much discussion in the arguments of respective counsel as to what may or may not constitute good will. We shall not undertake to set out the controlling features of good will when viewed as constituting an asset further than may be necessary to determine whether there is any evidence which shows the value thereof to the plaintiff on March 1, 1913, the date when the company was organized and when it is claimed it existed.

It will be remembered that prior to this date the company had done no business, although parties soliciting subscriptions for stock had obtained contracts which provided for taking out policies when the company came into existence. While these contracts may have had some value above the commissions paid to agents for obtaining them and the cost to the company of carrying the insurance risk, the amount thereof, if there was any such value, is not shown by the evidence. It was quite probable that the stockholders were moved to make these contracts by reason of the particular nature of the organization of the company, but the fact that they held stock in the company may have influenced them as much or more in agreeing to take out the insurance. However this may be, there is nothing here upon which any value was placed by the evidence, nor do we think any could be placed as a matter of good will. It may be argued that as soon as the company was organized it had certain advantages in acquiring the business of Catholics, and if we understand plaintiff's argument correctly this constituted good will of a very considerable value. Without determining whether such advantage in fact constituted good will in a

legal sense with reference to the tax statutes, we must again say that there is no satisfactory evidence of its value.

It should also be said in this connection that the fact that surrounding conditions make it likely that a new corporation will be able to secure a profitable business is not of itself sufficient to show that it possessed a valuable good will at the time it entered upon the transaction of business. Corporations are seldom formed unless those organizing them believe that the business to be carried on will be profitable, and that the time is favorable for creating a new corporation. Sometimes the anticipated results follow and the corporation is successful from the outset. If the judgment of the promoters be wrong, a loss or failure will result; but if successful, the success alone is not sufficient to prove the existence of good will. We have entered a finding to the effect that there is no satisfactory evidence of the good will, if any, that the plaintiff possessed, and therefore hold that the Commissioner was correct in refusing to make any allowance or deduction therefor in computing the tax upon the sale of plaintiff's assets.

■ The evidence shows that plaintiff paid commissions to the amount of $525,000 on the sales of its stock on two different occasions, one of which was before or at the time of its organization and the other a short period later. It is contended on behalf of the plaintiff that this expense is a part of the cost of organization of the company and should be amortized over the period of the organization thereof.

If the question thus raised were new and original, we think it might present an interesting problem. The Board of Tax Appeals and the courts, whenever the question has arisen of making a deduction by amortization or the discount on the sale of bonds or commissions paid for the allowance thereof, seem to have uniformly held in favor of the taxpayer. It would seem there was as much reason for allowing a commission upon the sale of stock sold for the purpose of obtaining capital as in allowing a commission on the sale of bonds for the same purpose where the length of time the capital so obtained by sale of stock is known as it was in this case. If there is a distinction it is because the issuance of bonds created an absolute liability, but the sale of stock did not. In each instance it may seem that the commissions were the cost of obtaining capital, and if the rule with reference to commissions on bonds is followed this cost

should be amortized over the period that the capital was used. But the decisions of the Board of Tax Appeals and of the courts which have considered the question, so far as they have decided it either directly or indirectly, all appear to be against the taxpayer. It is true that in most of these cases the corporation was still in existence and there was no way of determining for what length of time the capital which had been obtained by the sale of stock would be used and therefore no way of determining the amount of amortization for any particular year. But this fact was not given as a reason for any of these decisions. On the contrary they were based upon grounds which are entirely inconsistent with the allowance of the deduction claimed by plaintiff. In Simmons Co. v. Commissioner (C. C. A.) 33 F.(2d) 75, it was held, in effect, that commissions paid to bankers for sales of stock were not organization expenses nor "ordinary and necessary expenses" within the meaning of the tax law, and, further, that "commissions paid for marketing stock simply diminish the net return from the stock issue" and are equivalent to an issue of stock at a discount. This decision was rendered in 1929, and was based upon the Treasury regulations. The court gave as a reason for upholding the regulations the fact that they had existed and had been in force for a long time without any change in the law by Congress.

In Corning Glass Works v. Lucas, 59 App. D. C. 168, 37 F.(2d) 798, 68 A. L. R. 736, the rules laid down in the Simmons Co. Case, supra, were approved, and the court again called attention to the fact that its decision was supported by Treasury regulations promulgated under the Revenue Acts of 1921, 1924, 1926, and 1928, and also called attention to a Treasury decision promulgated in 1922 to the effect that a commission paid for marketing preferred stock was a capital expenditure, and said that this interpretation of section 234 (a) (1) of the Revenue Act of 1921 (42 Stat. 254) was impliedly approved by Congress through the re-enactment of the section in unchanged form in the Revenue Act of 1924, § 234 (a) (1), 26 USCA § 986 (a) (1). If the commission so paid was a capital expenditure, it is obvious that it is not an ordinary and necessary expense of business, and that it cannot be amortized as a part of the cost of obtaining capital, or treated as organization expense for the purpose of allowing a deduction therefor. In the Revenue Acts of 1926 and 1928, section 234 was re-enacted (as section 234 in 1926, 26 USCA § 986 and as section 23 in 1928, 26 USCA § 2023), and as the Revenue Acts enacted since have made no change in it the reasoning of the decisions in the two cases cited above applies with increased force. Plaintiff cites the cases of Hershey Manufacturing Co. v. Commissioner, 14 B. T. A. 867; Id. (C. C. A.) 43 F.(2d) 298, and Malta Temple Association v. Commissioner, 16 B. T. A. 409, but it is not necessary to review the decisions therein. Neither of the cases involved any question with respect to commissions paid or discounts allowed on the sale of corporate stock, but dealt only with organization expenses, and we are of the opinion that the commissions in question in the case now before us cannot be held to be organization expenses.

It thus appears that for more than thirteen years Treasury regulations have been promulgated denying any deduction on account of commissions paid for sales of stock, and from time to time the courts and the Board of Tax Appeals have approved these regulations. Although numerous Revenue Acts have been enacted since these regulations were first promulgated, Congress has not seen fit to take any action changing the statute. Under these circumstances, we think the law must be considered settled, and that no deduction can be allowed plaintiff on account of this matter.

In this connection we think it ought to be said that even if plaintiff's contention for amortization of the commissions involved were sustained, there does not appear to be any rule of law under which we could allow the plaintiff any further deduction than the pro rata part of such expenses for the last year. In other words, there does not seem to be any method of giving the plaintiff a complete and logical remedy under the theory that the commissions were part of cost of capital.

The plaintiff is entitled to recover the amount of improper excess in its taxes arising from the failure to allow as a deduction expenses incurred in acquiring the assets of the Columbian Fire Insurance Company of Indiana. Before judgment is entered, counsel for the respective parties may submit to the court a stipulation as to the amount of judgment which should be entered in accordance with this opinion if they can agree thereon. If not, they may submit computations of this amount as they respectively consider it should be determined, and upon consideration thereof the court will enter final judgment.