ESTATE OF GERTRUDE H. CROCKER, DECEASED, WILLIAM G. PARROTT, JR., ADMINISTRATOR, AND WILLIAM W. CROCKER, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 88086. Filed January 5, 1962.

*Franklin C. Latcham, Esq.*, for the petitioners.
*Donald G. Daiker, Esq.*, for the respondent.

OPINION.

OPPER, *Judge:* As in *Percy W. Phillips*, 30 T.C. 866 (1958), and *Harry Roff*, 36 T.C. 818 (1961), on appeal (C.A. 3, Nov. 20, 1961), we have before us two opposing theories as to the treatment of the excess which petitioner here received over the stipulated cost of a contract with an insurance company. Respondent contends first that the "sale" by petitioner should be disregarded because of its obvious motivation purely for tax purposes; and second, that even if a sale took place, the excess received by petitioner over his cost represented an item of ordinary income, such as interest, which had already attached to the property and which was sold with it; and that accordingly, whether or not the transaction was a sale or exchange, the gain must be taxed as ordinary income.

The same two contentions were made by respondent in *Percy W. Phillips, supra,* and in both respondent was unsuccessful. But there, "If the premiums called for by the policy had been paid annually there would have been no excess of cash value over cost." Here, as the parties have stipulated and as our findings show, the cash surrender value on the date of sale was greatly in excess of the premiums provided in the policy. The total "cash value" of all the policies at the time of assignment was over $120,000, whereas the total gross premiums due were but $106,595, and the net cost even smaller. We know also from the same source that "The reserve established for the cash surrender value of each policy was increased each year by an amount represented by the sum of the net annual premium, plus an

addition to the total value of the reserve computed by a 3% or 3½% factor."

The element of a guaranteed and predictable interest factor added to the premiums [1] was absent in *Percy W. Phillips, supra;* and it is not accident that under the facts there, a time could never arrive prior to maturity when, as in the instant case, the surrender value would exceed the total premiums. This circumstance seems to us to assimilate this situation to that in *Harry Roff, supra,* where "an interest rate of 3½ percent, compounded annually" and "a rate of 3¼ percent, compounded annually" were applied "to the effective rate of premium payments, i.e., total annual premium of $1,000 as reduced by $125 for administrative costs * * * [and] $1,000 less $170 for administrative cost." We find here, as was stated there, that "Because of the interest provided for by the contracts, the cash surrender values thereof * * * at the dates of the sales * * * were in excess of the total premiums called for by the policies."

In the *Roff* case, we held, as to respondent's second contention, that, although the transaction was to be treated as a sale of a capital asset, "the gains reaped by petitioner on the sales of the contracts, are attributable to interest accumulated under the contracts at fixed and predictable rates." Accordingly, we determined that "petitioner received the equivalent of interest on the sales of the contracts," commenting in the course of the Opinion that "upon surrender of the policy * * * petitioner would have been taxed on the gain as ordinary income. Sec. 72, I.R.C. 1954 * * *," [2] and that "Even though the property falls within the general definition of a capital asset, the sale under scrutiny may include the sale of certain ordinary income portions which will be taxed at ordinary rates."

Another distinction from *Percy W. Phillips, supra,* is that, except in one instance, the policies had all been paid up for some time. We are not advised when the "dividends" on these policies were credited, but the burden was on petitioner and we must assume that they were

---

[1] While the stipulation follows generally the form of the *Percy W. Phillips* findings, this one statement is naturally missing from the *Phillips* case.

[2] Sec. 72(e)(1), I.R.C. 1954, reads: SEC. 72, ANNUITIES; CERTAIN PROCEEDS OF ENDOWMENT AND LIFE INSURANCE CONTRACTS.

(e) AMOUNTS NOT RECEIVED AS ANNUITIES.—

(1) GENERAL RULE.—If any amount is received under an annuity, endowment, or life insurance contract, if such amount is not received as an annuity, and if no other provision of this subtitle applies, then such amount—

(A) if received on or after the annuity starting date, shall be included in gross income; or

(B) if subparagraph (A) does not apply, shall be included in gross income, but only to the extent that it (when added to amounts previously received under the contract which were excludable from gross income under this subtitle or prior income tax laws) exceeds the aggregate premiums or other consideration paid.

For purposes of this section, any amount received which is in the nature of a dividend or similar distribution shall be treated as an amount not received as an annuity.

all collectible after the policies became paid up. In that event they were—

"* * * dividends declared in the case of a *full-paid participating policy,* wherein the policyholder has no further premium payments to make. Such payments having been duly met, the policy has become at once a contract of insurance and of investment. The holder participates in the profits and income of the invested funds of the company." * * * [Emphasis added.]

* * * But in level-premium life insurance, while the motive for taking it may be mainly protection, the business is largely that of savings investment. The premium is in the nature of a savings deposit. Except where there are stockholders, the savings bank pays back to the depositor his deposit with the interest earned less the necessary expense of management. The insurance company does the same, the difference being merely that the savings bank undertakes to repay to each individual depositor the whole of his deposit with interest; while the life insurance company undertakes to pay to each member of a class the average amount (regarding the chances of life and death) ; * * *

* * * On the other hand, the service performed in level-premium life insurance is both protection and investment. Premiums paid—not in the tax year, but perhaps a generation earlier—have earned so much for the cooperators, that the company is able to pay to each not only the agreed amount but also additional sums called dividends; and have earned these additional sums, in part at least, by transactions not among the members, but with others; as by lending the money of the cooperators to third persons who pay a larger rate of interest than it was assumed would be received on investments. The fact that the investment resulting in accumulation or dividend is made by a cooperative as distinguished from a capitalistic concern does not prevent the amount thereof being properly deemed a profit on the investment. * * *

*Penn Mutual Co.* v. *Lederer,* 252 U.S. 523, 529, 531–532, 534 (1920).

When to that it is added that all of the "dividends" were composed to some extent of the investment profits of the company, see *Percy W. Phillips, supra,* it seems to us evident that the ordinary income character of the entire increase in value is so predominant that little basis exists for attributing some probably infinitesimal portion of petitioner's gain to "an increase in the value of the income-producing property." *Commissioner* v. *P. G. Lake, Inc.,* 356 U.S. 260, 266 (1958). Since perhaps most significantly of all, neither of the parties suggests that any such allocation should or could accurately be made, we deal with the total gain—that is, the difference between the stipulated "cost" and the amount received—as partaking of the nature of its overwhelmingly predominant characteristic—that of ordinary income.

We consequently regard the present circumstances as more nearly like those appearing in *Harry Roff, supra,* than in *Percy W. Phillips, supra,* and, accordingly, on the authority of the *Roff* case, we conclude that respondent must be sustained in his effort to have the gain received by petitioner taxed at ordinary income rates.

Petitioner makes much of the fact that in life insurance, as dis-

tinguished from annuities, the policy incorporates a benefit—payment in case of the insured's death—which is entirely different from the investment or interest-earning element. See *Harry Roff, supra.* The difficulty is that what obviously gave value to these policies, not perhaps to petitioner personally, but as the subject matter of a sale to a third person, was their cash value,[3] and, indeed, the purchaser kept them in effect for only a short time.

Petitioner insists that the situation here is comparable to that in *Bell's Estate* v. *Commissioner*, 137 F. 2d 454 (C.A. 8, 1943), reversing 46 B.T.A. 484 (1942); and *McAllister* v. *Commissioner*, 157 F. 2d 235 (C.A. 2, 1946), certiorari denied 330 U.S. 826, reversing 5 T.C. 714 (1945), and that, accordingly, what petitioner here sold was an asset accompanied by the right to receive future income upon it rather than to transfer that right without at the same time releasing the income-producing property, as in such cases as *Hort* v. *Commissioner*, 313 U.S. 28 (1941); and *Commissioner* v. *P. G. Lake, Inc., supra.* We regard the distinction so attempted as beside the point. Granting that petitioner parted completely with all his interest in the property transferred, which necessarily carried with it as part of its value all income to be earned in the future, cf. *Helvering* v. *Horst*, 311 U.S. 112 (1940); *Helvering* v. *Clifford*, 309 U.S. 331 (1940); *Helvering* v. *Eubank*, 311 U.S. 122 (1940), and accepting the effectiveness of the transaction as the sale of a capital asset, *Harry Roff, supra*, we are, nevertheless, dealing here with the receipt as part of the purchase price—and in addition to any payment attributable to the property sold—of an amount representing income which has already been earned and which would have been ordinary income if and when received by the vendor. *Tunnell* v. *United States*, 259 F. 2d 916 (C.A. 3, 1958). Such cases as the sale of a partnership interest including accumulated income, *United States* v. *Snow*, 223 F. 2d 103 (C.A. 9, 1955), certiorari denied 350 U.S. 831, the sale of a bond with accrued but unpaid interest, *Simon Jaglom*, 36 T.C. 126 (1961), on appeal (C.A. 2, Aug. 30, 1961), the sale of stock with a declared dividend, *Brundage* v. *United States*, 275 F. 2d 424, 427 (C.A. 7, 1960), certiorari denied 364 U.S. 831; *Herman M. Rhodes*, 43 B.T.A. 780 (1941), affd. 131 F. 2d 50 (C.A. 6, 1942), and the redemption of a certificate of indebtedness carrying unpaid interest, *Richard B. Gibbons*, 37 T.C. 569 (1961); *Rosen* v. *United States*, 288 F. 2d 658 (C.A. 3, 1961), are comparable. It was on that theory, as we understand it, that the Tax Court's conclusion in *Percy W. Phillips, supra*, was reversed (275 F. 2d 33, C.A. 4, 1960). It is also on that theory that it was concluded in *Harry Roff, supra*, that that part of the amount received from the sale of an annuity policy, which ex-

---

[3] Cf. cash value ($120,381.63) with sale price ($118,731.63).

ceeded cost and which represented interest already earned, must be treated as ordinary income and not capital gain.

Although a part of the total increment received by petitioner here may have been due to "dividends" rather than to a specified percentage of interest earned on the reserve attributable to his policy, it is clear that the greatest portion must have been due to the latter.[4] As we have said, neither party suggests that we should attempt to allocate the net amount received, in excess of cost, between the two sources, or that they differ as to their taxable quality. We accordingly conclude, as in *Harry Roff*, *supra*, that the amount received above the cost of the policy is ordinary income in its entirety and not capital gain, and that this excess is to be computed by subtracting, from the amount received, petitioner's cost as stipulated by the parties.

It is unnecessary here, as it was in *Harry Roff*, *supra*, to determine whether as between the Tax Court and the Court of Appeals, *Percy W. Phillips*, *supra*, was correctly decided. The Tax Court's position was founded on the situation there, which is different from that now before us; that except for dividends and certain prepayments, the surrender value of the policies would never have exceeded the amounts paid in by petitioner; and that, consequently, the proceeds of the sale were not attributed to interest earned on the policy. The Court of Appeals, to the contrary, regarded the situation as one where, to the property sold, there was added a right to receive income already accrued. The issue, as presented by the parties here, renders it unnecessary to determine, in this proceeding, which approach would have been correct had the present facts appeared in the *Phillips* case.

In order to take account of a clerical error in determining the deficiency,

*Decision will be entered under Rule 50.*

───

[4] We are given no information as to the extent to which the dividends themselves may also have been attributable to an income factor, such as favorable investments.