DONALD B. JONES AND BEVERLEY V. JONES, PETITIONERS, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 94347.   Filed May 9, 1963

*Donald B. Jones,* pro se.
*Alvin C. Martin,* for the respondent.

SCOTT, *Judge:*  Respondent determined deficiencies in petitioners' income tax for the calendar years 1957 and 1959 in the amounts of $1,981.28 and $1,286.23, respectively.

The issues for decision are:

(1) Whether the gain realized by petitioners upon the transfer of a remainder interest in each of two trusts after the death of the life tenant but prior to distribution, constitutes ordinary income or long-term capital gain.

(2) Whether the net cost of insurance premiums paid by petitioners on an insurance policy insuring the life of the remainderman of each trust until after the death of the life tenant is to be added to the cost to petitioners of the remainder interest in determining the adjusted basis of such interest.

Most of the facts have been stipulated and are found accordingly.

Petitioners, Donald B. Jones and Beverley V. Jones, husband and wife residing in Delaware Township, Hunterdon County, N.J., filed joint Federal income tax returns for each of the years 1957 and 1959, on the cash basis of accounting, with the district director of internal revenue at Newark, N.J.

Donald B. Jones (hereinafter referred to as petitioner) is an attorney at law of the State of New Jersey, practicing in Newark. From time to time since 1949 petitioner has purchased remainder interests in trusts. Generally, after the death of the life tenant but prior to the distribution of the estate remainder of the trust, petitioner transfers his interest therein. Petitioner's primary purpose in making such transfers is to achieve capital gains treatment for income tax purposes.

The two remainder interests with which the issue in this case is concerned are an interest in a trust established under the will of George H. Gardiner (hereinafter referred to as the Gardiner trust) and an interest established in an *inter vivos* trust of Manya L. Mosessohn (hereinafter refered to as the Mosessohn trust).

George H. Gardiner died on December 10, 1936, leaving a will, probated in the Surrogate's Court of Kings County, Brooklyn, N.Y., on December 28, 1936. George H. Gardiner was survived by his widow, Margaret B. Gardiner, and his brother, William W. Gardiner. William died in 1942, survived by his daughter, Mildred G. Engstrom Heeney (hereinafter referred to as Mildred Heeney). Article 8 of George H. Gardiner's will directed that the residue of his estate be placed in trust and that the income be paid to his wife, Margaret B. Gardiner, annually during her lifetime, plus such portions of the principal as would guarantee a minimum annual income therein stated, and upon the death of Margaret B. Gardiner the trustees were directed to distribute nine-twentieths of the principal of the trust fund to the testator's brother, William W. Gardiner, or "if he then be dead to his descendants then living."

After the death of her father Mildred Heeney made various sales of portions of her interest in the Gardiner trust. One of the sales was an assignment dated December 23, 1952, from Mildred Heeney to Harry Sanger of a $20,000 interest, which assignment recited that it was made free and clear of any liens, claims, encumbrances, advances, or assignments, except seven prior assignments listed therein, three of which were for a one-eighth interest in Mildred Heeney's share of the Gardiner trust, two for a one-sixteenth interest, one for a one-eightieth interest, and one for a two-eightieths interest.

Harry Sanger (hereinafter referred to as Sanger) is a dealer in estate interests of heirs and beneficiaries of trusts. He has been en-

gaged in this business for more than 25 years. He has bought and sold remainder estates consisting of vested remainders as well as remainder estates which are contingent remainders. The clientele to whom Sanger sells remainder interests is limited to persons who are willing to take a gamble with some of their capital. Sanger has never sold a remainder interest after the death of a life tenant. Sanger only buys remainder interests in trusts or estates where the life tenant is 60 to 65 years of age.

On January 14, 1953, Sanger transferred a $10,000 undivided interest in the Gardiner trust to petitioner for the sum of $3,500. At the time Sanger purchased the remainder interest from Mildred Heeney he had taken out a life insurance policy on Mildred Heeney's life since under the provisions of the Gardiner trust it was necessary that Mildred Heeney be living at the date of death of the life tenant in order for her remainder interest to vest in her. At the time petitioner purchased the $10,000 interest in the Gardiner trust from Sanger, he also purchased from Sanger, Sanger's interest in an ordinary life insurance policy in the amount of $6,000 issued to Sanger on the life of Mildred Heeney by the Continental Assurance Co. on January 9, 1953. Petitioner paid Sanger the amount of the first annual premium for the purchase of the policy and paid subsequent annual premiums directly to the issuing company. The policy contained 2-year suicide and contestable clauses. When petitioner purchased the interest in the Gardiner trust on January 14, 1953, he was not able to establish the exact age of the life tenant, Margaret B. Gardiner, but believed that as of that time she was somewhere between 65 and 75 years old.

Margaret B. Gardiner died on April 15, 1957. A death certificate for her states her date of birth as December 4, 1880. On April 18, 1957, petitioner received information that Margaret B. Gardiner, the life tenant of the Gardiner trust, died on April 15, 1957, and addressed a letter to the Guaranty Trust Co. of New York, the trustee of this trust, in which he stated that he carried life insurance on the life of the remainderman which could be canceled upon the death of the life tenant and requested verification of the death of the life tenant. On petitioner's office copy of this letter he caused to be typed the following note:

NOTE: I have this day been advised by Harry Sanger that the life tenant, Margaret B. Gardiner, died in Nassau County on Monday, April 15, 1957.

After verification of this fact with the Trustee, send in the life insurance policy for cancellation and return of cash value etc. and then make arrangements with someone to purchase this estate.

D.B.J.

Under date of April 22, 1957, petitioner wrote the following letter to Walter Martin (hereinafter referred to as Martin) of New York City:

I have a $10,000 interest in a Testamentary Trust estate. Margaret B. Gardiner, the life tenant, died on April 16 [*sic*], 1957. Now that she has died, no life insurance needs to be continued and the estate should be distributed within a few months.

Would you be interested in purchasing this estate from me?

Martin wrote petitioner that he would be pleased to purchase petitioner's interest in the Gardiner trust and would await his further advices.

On June 10, 1957, petitioner transferred his $10,000 interest in the Gardiner trust to Martin for $9,400. The transfer was by an assignment under seal which recited that petitioner did thereby "bargain, sell, transfer, assign, and set over unto" Martin "his heirs, executors, administrators and assigns" the $10,000 undivided interest in the principal of the Gardiner trust. The assignment stated that it should be binding upon petitioner's heirs, executors, and administrators. On June 10, 1957, Martin paid petitioner $1,000 by check and delivered to petitioner his promissory negotiable demand note dated July 10, 1957, in the face amount of $8,400 bearing interest at 4 percent, and also delivered to petitioner a document under seal reassigning to petitioner the $10,000 interest in the principal of the Gardiner trust as security for the payment of the principal balance of the purchase price of petitioner's interest in the Gardiner trust in the amount of $8,400 with interest thereon at 4 percent per annum.

On January 9, 1958, the fifth anniversary of the insurance policy on the life of Mildred Heeney which petitioner had purchased from Sanger, petitioner surrendered the policy for $432. The net cost of insurance premiums on this policy to petitioner during the time it had been in effect after deducting dividends and surrender value was $442.98.

Petitioner was not aware until March 1958 that the trustee of the Gardiner trust intended to ask for instructions of the Surrogate's Court of Kings County, Brooklyn, N.Y., as to whether Mildred Heeney and her assignees were entitled to receive nine-twentieths of the principal of the Gardiner trust (being the correct fraction if the principal of the Gardiner trust were distributed on a per stirpes basis) or three-twentieths of the principal of the Gardiner trust (being the correct fraction if the principal of the Gardiner trust were distributed on a per capita basis).

The trustee thereafter on March 12, 1958, did request such instructions of the Surrogate of Kings County, and on August 13, 1959, the surrogate rendered a written opinion that the trust required a per capita distribution. The facts show that Mildred Heeney had two minor daughters living at the date of the death of the life tenant of the Gardiner trust. The surrogate's opinion held that the word "descendants" as used in the will of George H. Gardiner in connection

with the distribution of the principal of the trust fund if William W. Gardiner were not living at the date of death of the life tenant, referred not only to children of William W. Gardiner but included children of the children of William W. Gardiner and that the intent of the will was for a per capita distribution to the descendants of William W. Gardiner, thus entitling the two minor daughters of Mildred Heeney to share equally with her in the distribution and that Mildred Heeney's share was three-twentieths and not nine-twentieths of the trust principal. There were 28 claimants to Mildred Heeney's share of the Gardiner trust including Mildred Heeney, herself.

On July 22, 1960, an agreement of compromise was entered into by the parties interested in the principal of the Gardiner trust. The agreement of compromise recited the facts with respect to the establishment of the Gardiner trust; the provisions of article 8 of the will of George H. Gardiner providing for this trust; and the facts that Mildred Heeney had from time to time assigned to various persons fractional shares and dollar amounts of her interest in the residual trust, that certain of the assignees of Mildred Heeney had reassigned their interest in whole or in part, that two creditors of Mildred Heeney had given notice of their interest in the residual trust by reason of judgments they had obtained against Mildred Heeney, that the parties were aware that to litigate further the issue involved would entail substantial expense and delay, and that the outcome of such other litigation would be uncertain. This agreement then recited that in consideration of the premises and of other good and valuable considerations, the parties agreed, subject to the approval of the surrogate of the County of Kings, that an order or decree should be filed and entered directing payment or distribution of the principal and income of the residuary trust passing under subdivision (2) of article 8 of the will of George H. Gardiner in the following manner:

a. From said principal and income pay such charges, expenses, commissions and allowances in the above entitled proceeding in such amounts and in such manner as the Surrogate may hereafter direct.

b. From the principal thereafter remaining pay to the following parties the sums set forth after their respective names:

\*        \*        \*        \*        \*        \*        \*

(15)  Walter F. Martin the sum of $10,000

\*        \*        \*        \*        \*        \*        \*

(28)  Mildred Heeney the sum of $27,500

c. Pay the balance of principal and income in equal shares to the duly appointed general guardian of the property of Laurel H. Engstrom and the duly appointed general guardian of the property of Arden W. Engstrom.

On October 3, 1960, Martin received $10,000 from the trustee of the Gardiner trust.

On October 11, 1960, Martin paid petitioner $9,520 of which $8,400 represented the principal balance on his note dated June 10, 1957, and

$1,120 represented accrued interest. The $9,520 was paid by check which was enclosed with a letter setting forth the computation of the amount and stating in part:

Accordingly, I enclose my check to your order for $9,520. Please return my note and security assignment so that I may destroy them.

As you can see, I did not fare too well in this case.

On January 22, 1931, Manya L. Mosessohn created an *inter vivos* trust (hereinafter referred to as the Mosessohn trust), naming the Irving Trust Co. as trustee. The grantor was to receive the income from the trust property during her lifetime. There was a provision that if during the first 10 years of the trust the income were below a certain amount, the deficiency might be made up from principal and a limited right to withdraw principal to cover the cost of serious illness, and a provision that if the grantor remarried, one-half of the income would thereafter be paid to her and one-half to her son.

Article second of the Mosessohn trust agreement provided as follows:

SECOND: Upon the death of Grantor, $10,000. shall be paid to Boris D. Mosessohn and the income on the balance paid to him until five years have elapsed from that time, at which time the sum of $15,000. shall be paid to him out of the principal and the income continued on the balance until five years further have elapsed, at which time an additional $15,000. is to be paid to him out of the principal and the income on the balance of the principal shall be paid to him for life. If said Boris D. Mosessohn should predecease the Grantor, then upon the death of the Grantor or upon the death of said Boris D. Mosessohn after the death of the Grantor whether such death shall occur before any of the principal payments are made to him hereunder or afterwards, then and in either event the Trustee shall pay over the principal of the trust estate or so much thereof as may remain in its hands, one-half to the widow of said Boris D. Mosessohn and the remaining half equally among the children of said Boris D. Mosessohn, and if he leaves no children but leaves a widow, the entire principal of the trust fund or so much thereof as may remain in its hands shall be divided between his said widow and Moses D. Mosessohn, brother-in-law of the grantor, equally. * * *

On July 19, 1954, Boris M. Dayyan (formerly known as Boris M. Mosessohn) assigned an interest in the Mosessohn trust estate to the extent of $10,000 to Sanger. On August 5, 1954, Sanger assigned this $10,000 interest to petitioner for a purchase price of $3,000.

Sanger had obtained an ordinary life insurance policy on the life of Boris M. Dayyan (hereinafter referred to as Dayyan) in the face amount of $4,000, issued on July 19, 1954, by the Manhattan Life Insurance Co. This policy contained 2-year suicide and contestable clauses. At the time petitioner purchased the interest in the Mosessohn trust from Sanger, he also purchased this interest in the life insurance policy. Petitioner reimbursed Sanger for the first year's premium of $175.44 and thereafter paid annual premiums to the issuing company until he surrendered the policy in August 1958.

In 1954, when petitioner purchased the Dayyan interest in the Mosessohn trust, he was unable to establish the exact age of the life tenant. Petitioner believed that in 1954 she was somewhere in her sixties. Manya L. Mosessohn died on March 14, 1958, and petitioner learned of her death sometime prior to August 1958.

Shortly prior to June 25, 1959, petitioner offered to transfer his interest in the Mosessohn trust to Martin for the sum of $10,000, and on June 25, 1959, petitioner assigned his interest in the Mosessohn trust to Martin by a general assignment under seal similar to the assignment whereby petitioner had assigned his interest in the Gardiner trust to Martin. On June 25, 1959, Martin paid petitioner $1,000 by check and delivered to petitioner his promissory demand note in the face amount of $9,000 bearing interest at 6-percent per annum. Martin, on June 25, 1959, executed and delivered to petitioner an assignment of the interest in the Mosessohn trust as security for the payment of the principal balance of the purchase price together with interest thereon, which assignment was similar to the assignment for security which Martin had delivered to petitioner in connection with the Gardiner trust.

Under date of June 24, 1959, Martin wrote the following letter to petitioner:

Herewith check to your order for $1,000. in re Mosessohn Estate. I anticipate receipt of the assignments etd. [*sic*]

I will also be interested in the status of the Gardiner matter and appreciate very much your furnishing me with copies of the file since we seem to have misplaced ours.

Shortly prior to October 29, 1959, the court having jurisdiction over the Mosessohn trust determined that the amount payable under the Dayyan assignment was $10,523.20, but that $250 thereof should be withheld by the trustee as a reserve for possible estate taxes with respect to the estate of Manya L. Mosessohn.

Shortly prior to October 29, 1959, Martin received $10,273.20 from the Mosessohn trust. On October 29, 1959, Martin paid petitioner $8,995 by check and $250 by transferring the amount withheld by the trustee. The total of these two payments, $9,245, represented the balance of principal and interest on the promissory note plus a $65 charge made by petitioner for travel time and disbursements incurred in court appearances.

Under date of October 29, 1959, Martin wrote a letter to petitioner in regard to the Mosessohn trust, which he stated was for their respective records, reciting his purchase of petitioner's interest in the trust, the $1,000 payment and the $9,000 note, the payment received from the court, and the payment being made to petitioner under petitioner's agreement to accept the sum of $250 presently withheld as

part of the payment of the principal of the note and requested that his note and the assignment given as collateral therefor be returned.

The net cost of premiums paid by petitioner on the insurance policy insuring Dayyan's life from the time petitioner acquired the policy until its surrender in August 1958, after crediting dividends and cash surrender value, was $404.80.

Petitioner and Martin were classmates at college and have known one another since 1933. They have lunch together two or three times each week. Martin is in the insurance business in New York City. Petitioner has purchased some life insurance from Martin and carries fire and casualty insurance with his firm. Both prior and subsequent to the transfers involved in this case, petitioner has transferred other remainder interests to Martin after the death of the respective life tenants on a basis substantially similar to that used with respect to the two transfers here in issue. Martin has never acquired any such interest from anyone except petitioner. Petitioner was not during the years here involved a dealer in remainder interests.

On his income tax return for the year 1957 petitioner reported a long-term capital gain the amount of $5,457.02 from the sale of "Interest in Gardiner Estate" which represented the difference between $9,400 shown as the sales price and $3,942.98 shown as the cost or other basis of this interest. On his income tax return for 1959, petitioner reported a long-term capital gain of $6,595.20 from the sale of his interest in the Mosessohn trust which was the difference in a gross sales price of $10,000 and cost or other basis of $3,404.80.

Respondent in his notice of deficiency determined that the amount of $5,457.02 from the "claimed sale" of an interest in the George H. Gardiner estate reported as a long-term capital gain was ordinary income because "the claimed sale" of the interest was "anticipatory of the ordinary income to be derived" from the interest. Respondent further increased petitioner's income by the amount of $442.98 with the following explanation:

The $442.98 addition to the cost basis of the interest held by Donald B. Jones in the testamentary trust created by George N. [sic] Gardiner, which you included in your cost basis in computing gain on the claimed sale of this interest, is not allowed since it represents costs of insurance premiums (less cash surrender value) that are allocable to life insurance proceeds, which, when and if paid, would constitute tax exempt income to Donald B. Jones.

For the year 1959 respondent determined that the amount of $6,595.20 reported by petitioner as long-term capital gain from the "claimed sale" of an interest in the Mosessohn estate constituted ordinary income "because the claimed sale of this interest was anticipatory of the ordinary income to be derived from this interest." The respondent increased petitioner's reported income by $404.80 representing the addition to cost basis of petitioner's interest in the Mosessohn trust because it represented the cost of insurance premiums, giving the same ex-

planation for this adjustment as given with respect to the similar adjustment in 1957.

Respondent has conceded that he was in error in an adjustment made in the notice of deficiency, to which error was assigned in the petition, with respect to a resale in 1957 by petitioner of an interest in a trust estate to the remainderman from whom petitioner had purchased the interest.

OPINION

Petitioner takes the position that the remainder interests purchased by him are capital assets as defined in section 1221 of the Internal Revenue Code of 1954, that he sold these capital assets after having held them for more than 6 months, and that the gain received from the sale is long-term capital gain.

Respondent apparently admits that the remainder interests were capital assets held by petitioner for over 6 months.[1] His primary position is that the transfer of these interests by petitioner to Martin did not constitute a bona fide sale but in substance was nothing more than the use of Martin as an agent or conduit for collection of these interests which had become vested because of the death of the life tenant. In the alternative, respondent contends that if the transfers of these interests by petitioner to Martin constitued bona fide sales, such sales would not accomplish the conversion into capital gain of profits which would shortly have been received by petitioner as ordinary income.

The parties agree that had petitioner retained the remainder interests which he had purchased until he received from the trustees his share of the proceeds of the trust principals, the gain derived would constitute ordinary income. *Joseph A. Guthrie*, 42 B.T.A. 696 (1940).

Whether or not the transfers by petitioner to Martin were bona fide sales is a question of fact. Petitioner concedes that the transfers were primarily for the purpose of having the gain taxable to him at capital gains rates, and there is nothing in the record to show any other purpose for these transfers. On the basis of the record, we find, as respondent contends, that the transfers were planned and carried out solely for the purpose of having the resultant gain taxable as long-term capital gain. However, we agree with petitioner that if the transfers were, in fact, bona fide sales in that they were absolute and effected a good faith transfer of the assets from petitioner to Martin, they are not to be considered as ineffective solely because the purpose thereof was to have the gain be taxable as long-term capital gain. *F. Rodney Paine*, 23 T.C. 391 (1954), reversed on another issue 236 F. 2d 398 (C.A. 8, 1956). In a number of situations we have passed upon transfers of

---

[1] This is apparently the basis of the concession by respondent that the gain on the resale of an interest in a trust to the remainderman in 1957 prior to the death of the life tenant was correctly reported by petitioner as capital gain.

property for the sole purpose of having the gain taxable as capital gain. In *Theodore H. Cohen*, 39 T.C. 1055 (1963), we held an assignment, in form, of certain insurance policies to the taxpayer's insurance broker not to constitute, for tax purposes, a bona fide sale of the policies. We found the relationship between the taxpayer therein and the broker to be one of principal and agent and that the taxpayer had surrendered the policies to the respective insurance companies through his agent. In that case we stated:

In holding as we do, we are not unmindful of our decisions in *Bolling Jones, Jr.*, 39 T.C. 404 (1962) ; *Estate of Gertrude H. Crocker*, 37 T.C. 605 (1962) ; and *Harry Roff*, 36 T.C. 818 (1961), affd. 304 F. 2d 450 (C.A. 3, 1962), in which we upheld the sales of various insurance policies to third parties. Those cases are distinguishable from this in that, here, the petitioner retained the incidents of ownership in the policies until their surrender; Rosenbaum, as agent, was bound to surrender the policies and forthwith to pay petitioner the proceeds; and his obligation to pay petitioner arose only after the surrender of the policies. These factors negative the possibility of holding that the parties entered into a sales agreement.

The facts in the instant case show a bona fide sale. The assignment was unconditional and the reassignment clearly showed that it was solely as security for the note. The sale passed the economic interests and the purchaser's obligation to pay the purchase price was unconditional. This is demonstrated by the situation which arose when collection was delayed in connection with the Gardiner trust. Instead of making a profit of approximately $600, representing the difference in the face amount of the interest purchased and the $9,400 paid petitioner therefor, Martin, in fact, lost about $500 on the transaction represented by the amount of interest paid petitioner in excess of the $600 discount on the purchase. We think the situation here is more comparable to those cases in which we have held a transfer to constitute a bona fide sale. *Bolling Jones, Jr.*, 39 T.C. 404 (1962).

An aspect of the situation that respondent does not discuss is why petitioner, a cash basis taxpayer, would have received any income from his interest in the Gardiner trust in 1957 if he made no bona fide sale to Martin. The only cash petitioner received in 1957 was the $1,000 check. If the sale to Martin is not viewed as bona fide, Martin's note to petitioner could not be considered bona fide so as to constitute property of a value of its face amount received by petitioner in 1957. If the sale by petitioner to Martin were not bona fide but Martin was acting as an agent or conduit for petitioner, petitioner did not receive payment for his interest in the trust until 1960 when the trustee made payment to Martin. We hold petitioner's sales of his interests in the Gardiner and Mosessohn trusts to Martin to be bona fide sales.

The more difficult question is whether the sales were anticipatory assignments of income. These sales were made at a time when the

contingent interest in the trust which petitioner had purchased had ripened into a vested interest by the death of the life tenant. In this sense of the word, the income which would result from petitioner's purchase of the trust interest had accrued. Had petitioner merely held these interests until he received the amounts thereof from the trustees, the profit would have been ordinary income. *Joseph A. Guthrie, supra.* Petitioner points out that the basis of the holding in the *Guthrie* case was that there was no sale or exchange of a capital asset since a payment of an amount is not a sale or exchange. The principle of the *Guthrie* case has been applied in cases involving payments or compromises of judgments, notes, or similar assets. *John H. S. Lee,* 42 B.T.A. 920 (1940), affd. 119 F. 2d 946 (C.A. 7, 1941); *Mace Osenbach,* 17 T.C. 797 (1951), affd. 198 F. 2d 235 (C.A. 4, 1952); *Estate of Ernst Zobel,* 28 T.C. 885 (1957); and *Tombari* v. *Commissioner,* 299 F. 2d 889 (C.A. 9, 1962), affirming 35 T.C. 250 (1960). In these cases there is a recognition that the asset involved was a capital asset in the hands of the taxpayer involved. There is in these cases some implication that had a sale or exchange occurred the gain would have constituted capital gain. Cf. *Estate of Clarence E. Lehr,* 18 T.C. 373 (1952). However, where the sale is in part of a right to receive income, such portion of the payment has been held to be taxable as ordinary income irrespective of the sale. *Simon Jaglom,* 36 T.C. 126 (1961), affd. 303 F. 2d 847 (C.A. 2, 1962).

A taxpayer cannot convert what would come to him as ordinary income into capital gain by a sale in which the consideration is essentially a substitute for the amount he would otherwise receive as ordinary income. *Commissioner* v. *P. G. Lake, Inc.,* 356 U.S. 260 (1958). In that case the Supreme Court stated:

The purpose of Section 117 was "to relieve the taxpayer from * * * excessive tax burden on gains resulting from a conversion of capital investments, and to remove the deterrent effect of those burdens on such conversions." See *Burnet* v. *Harmel,* 287 U.S. 103, 106. And this exception has always been narrowly construed so as to protect the revenue against artful devices. See *Corn Products Refining Co.* v. *Commissioner,* 350 U.S. 46, 52.

We do not see here any conversion of a capital investment. The lump sum consideration seems essentially a substitute for what would otherwise be received at a future time as ordinary income. The pay-out of these particular assigned oil payment rights could be ascertained with considerable accuracy. * * *

In the instant case when the life tenant died, petitioner's rights to distribution from the trusts became fixed. The amount of the payment he would receive could be anticipated with reasonable accuracy. Petitioner in effect admits that this is the situation with respect to the Mosessohn trust interest sold in 1959. He argues that his right to payment of the Gardiner trust interest and the amount of such payment could not be anticipated with reasonable accuracy at the date he

sold this interest to Martin. At the time petitioner sold his interest in the Gardiner trust to Martin, he thought that the principal would be distributed in the near future. He did not know of the trustee's intent to request an interpretation of the trust provisions of the will. In fact, distribution was delayed by the litigation which ensued from the trustee's request for an interpretation of the provisions of the will. However, there is nothing in the record to indicate that petitioner's $10,000 interest was not fixed and ascertainable in amount even if the distribution to Mildred Heeney were held to be only a three-twentieths interest. The record tends to indicate that it was fixed. Prior to the assignment to petitioner, Mildred Heeney had assigned interests amounting to only forty-three eightieths of her interest. From the figures in the compromise settlement of the distribution to Mildred Heeney and her assignees, it appears that her interest would have been sufficient in any event for Martin to receive payment in full of the interest assigned to him by petitioner. Certainly, there is nothing in the record to indicate to the contrary. Petitioner argues that the fact that Martin in the settlement received only the $10,000 principal of his assigned interest and not a proportionate part of the trust income applicable thereto indicates that the amount of petitioner's interest was not fixed and ascertainable at the date of death of the life tenant. There is nothing in the record to show that there was in fact any trust income applicable to Martin's interest and since the agreement directed certain charges, expenses, and commissions to be paid from principal and income, it may well be that if there were any such income it would have been consumed in such payment. In any event the record contains nothing from which a conclusion can be drawn that there would have been trust income to be allocated to the $10,000 interest assigned by petitioner to Martin, had no dispute as to the interpretation of the Gardiner will arisen. The fact that petitioner sold the $10,000 interest to Martin for $9,400 whereas he sold the $10,000 interest in the Mosessohn trust to Martin for $10,000 at a time when he must have been able to ascertain reasonably the income interest applicable to the Mosessohn trust interest would indicate that it was not anticipated that an income interest would attach to the principal interest in the Gardiner trust. All that the facts here show to be left in doubt at the date of death of the life tenant was the date of the payment of petitioner's interest in the Gardiner trust. There is no evidence to indicate that any doubt existed at that time whether it would be paid in full in the future.

Respondent relies on *Estate of Gertrude H. Crocker*, 37 T.C. 605 (1962); *Harry Roff*, 36 T.C. 818 (1961), affd. 304 F. 2d 450 (C.A. 3, 1962); and *Commissioner* v. *Phillips*, 275 F. 2d 33 (C.A. 4, 1960), reversing 30 T.C. 866 (1958), in support of his contention that a bona fide sale will not convert an amount which would otherwise be received

as ordinary income into capital gain. Petitioner points that each of those cases involved a sale of an insurance policy in which the excess of the cash surrender value over the payments made was due primarily to the accrual of interest on the amounts paid in. Petitioner states that reliance was placed in those cases on the fact that interest is a type of income which is specifically recognized as ordinary income. Petitioner contends that the same philosophy caused the courts to hold that the gain derived from the retirement of certain investment certificates upon their maturity constituted ordinary income and not capital gain. *Rosen* v. *United States*, 288 F. 2d 658 (C.A. 3, 1961); *Commissioner* v. *Morgan*, 272 F. 2d 936 (C.A. 9, 1959); and *Richard B. Gibbons*, 37 T.C. 569 (1961). Cf. *Don O. Scott*, 26 T.C. 869 (1956).

Petitioner argues that the increments here involved are the type that would constitute capital gain upon payment of the interests except for the fact that if the amounts were paid by the trustees no sale or exchange would have occurred. Under these circumstances petitioner states that the gain should be treated as capital gain where a sale does occur even though such sale is made for the sole purpose of meeting the provisions of the Code providing for more favorable tax treatment of gains from the sale of capital assets than of other income. *Conrad N. Hilton*, 13 T.C. 623 (1949).

We do not consider petitioner's contention to be persuasive. Had the interests in the trusts been sold prior to the date of death of the life tenant, the situation would be more comparable to the sale of the note which the debtor was currently unable to pay in *Conrad N. Hilton*, *supra*. The sale here, though bona fide, is more comparable to the transfer of the currently payable portion of the note in the *Hilton* case, which we held not to be a bona fide sale. Petitioner sold his interests after his right to receive payment thereof had matured. "A sale of a right to receive in the future ordinary income already accrued produces ordinary income rather than capital gain." *Charles T. Fisher*, 19 T.C. 384, affd. 209 F. 2d 519 (C.A. 6, 1954), quoted in *Charles E. Sorensen*, 22 T.C. 321, 342 (1954). Cf. *V. David Leavin*, 37 T.C. 766 (1962). We sustain respondent in his determination that the gain to petitioner on the sale of his interests in the Gardiner trust and the Mosessohn trust constituted ordinary income.

Respondent contends that in determining his gain on the sale of his interests in the Gardiner and Mosessohn trusts petitioner is not entitled to add to his costs thereof the net amounts he expended to insure the lives of the individuals from whom he purchased the contingent interests until the date of death of the life tenants. The primary basis of respondent's contention is that had petitioner received the proceeds of the insurance policies, such proceeds would not have been taxable to petitioner under the provisions of section 101(a)(1) of the Internal

Revenue Code of 1954.[2]  Respondent relies on *Donald B. Jones*, 25 T.C. 4, 12 (1955), affirmed per curiam 231 F. 2d 655 (C.A. 3, 1956), a case involving the same taxpayer as petitioner herein.  It is respondent's position that if deduction of an amount would be prohibited by section 265 of the Internal Revenue Code of 1954 because of its being attributable to an item which would not constitute taxable income, the same amount cannot be used to increase the basis of property.  Petitioner points out that he, himself, took out the insurance policies involved in *Donald B. Jones, supra,* but in the instant case he acquired the policies through assignment from Sanger at the same time he acquired the interests in the two trusts and that, therefore, any income over and above his payments on the policies would not have been excluded from his gross income had he received payment of the policies. It appears that this distinction made by petitioner is well taken.

Petitioner kept the insurance only so long as he had an insurable interest in the life of the contingent beneficiary whose interest in the trust he had purchased.  In each of these trusts it was necessary for the person whose interest petitioner had purchased to be alive at the date of death of the life tenant in order to be entitled to distribution.  Petitioner makes some argument that in the case of the Mosessohn trust it was necessary for the person whose interest he purchased to be living at the date of distribution, but we agree with respondent that this is not a proper interpretation of the provisions of the instrument.  Petitioner in each case canceled the insurance shortly after receiving notice of the death of the life tenant, any insurable interest he had in the life of the person whose interest in the trust he had purchased being removed upon such life tenant's death.  The insurance carried by petitioner here is in the nature of insurance carried by a person to protect the payment of a debt to him or by a builder of a house to protect his interest in the house until its construction is completed.  We have held that insurance premiums paid by a creditor to whom an insurance policy on the debtor's life has been assigned by the debtor as security are deductible as ordinary and necessary business expenses where the payments are made with the hope of recovery of the full amount of the

---

[2] SEC. 101 CERTAIN DEATH BENEFITS.

 (a) PROCEEDS OF LIFE INSURANCE CONTRACTS PAYABLE BY REASON OF DEATH—

  (1) GENERAL RULE.—Except as otherwise provided in paragraph (2) and in subsection (d), gross income does not include amounts received (whether in a single sum or otherwise) under a life insurance contract, if such amounts are paid by reason of the death of the insured.

  (2) TRANSFER FOR VALUABLE CONSIDERATION.—In the case of a transfer for a valuable consideration, by assignment or otherwise, of a life insurance contract or any interest therein, the amount excluded from gross income by paragraph (1) shall not exceed an amount equal to the sum of the actual value of such consideration and the premiums and other amounts subsequently paid by the transferee. The preceding sentence shall not apply in the case of such a transfer—

   (A) if such contract or interest therein has a basis for determining gain or loss in the hands of a transferee determined in whole or in part by reference to such basis of such contract or interest therein in the hands of the transferor, or

indebtedness. *Charleston National Bank*, 20 T.C. 253 (1953), affd. 213 F. 2d 45 (C.A. 4, 1954). We have held that the premiums paid while a building is under construction are part of the cost of the capital asset. *The Columbia Theatre Co.*, 3 B.T.A. 622 (1926). Cf. *W. P. Brown and Sons Lumber Co.*, 26 B.T.A. 1192, 1197 (1932). In *Commissioner* v. *Charleston National Bank*, 213 F. 2d 45 (C.A. 4, 1954), in affirming this Court's decision, the circuit court stated:

> It is not easy in every case to determine whether an expenditure is an ordinary and necessary expense in the course of carrying on a trade or business or an investment of capital. Experienced and trained accountants often find the decision of such a question difficult in a given case and it is interesting to note that in the present instance neither the Commissioner nor the taxpayer has followed a consistent course in accounting for the premiums paid by the taxpayer during the period 1931 to 1945.
>
> \* \* \* \* \* \* \*
>
> The decision whether the amount may be charged off in the taxable year or must be added to the cost basis of a capital asset is not found in a single phrase or rule of thumb; it depends upon the nature of the business and the factors involved; \* \* \*

In the instant case petitioner at the time of payment of the premiums had no way of knowing over what length of time the payments would be made, whether at the date of the death of the life beneficiary of the trust the cash surrender value of the insurance policy would equal or exceed the premiums paid, or whether the insured would predecease the life beneficiary, and thus the insurance constitute whatever return petitioner obtained from the investments he had made in the contingent trust interests. Under these circumstances, we believe that the net payments which petitioner had made prior to the removal of these contingencies properly became a part of petitioner's capital investment in the interests in the trusts and should be added to the amount he paid therefor in computing the gain received from the transactions. "The insurance premium \* \* \* added nothing to the value of" the trust interest, but it is certainly not unusual to expect that such interest would be protected by payment of these premiums. *W. P. Brown & Sons Lumber Co., supra.* These payments obviously were not connected with a trade or business of petitioner's since he was not in the trade or business of selling interests in trusts. Whether they are deductible as nontrade or nonbusiness expenses in the year in which paid depends upon whether they are a current expense or capital outlay. The payments were made to protect petitioner's investment in the trust interests. At the time of payment there was no method of ascertaining whether the cash surrender value of the policies at the dates of the death of the life tenants of the trusts would be greater or less than the premiums paid. Under the facts here present we believe these payments were capital in nature. The facts in *Columbian Nat. Fire Ins. Co.* v. *United States*, 9 F. Supp. 688 (Ct. Cl.

1935), relied on by respondent make it distinguishable from the instant case. We hold that petitioner was correct in his treatment of the net cost of the insurance he carried as an addition to his basis in the interest in each of the two trusts.

*Decision will be entered under Rule 50.*